OPINION OF THE COURT
 

 Bellacosa, J.
 

 Confronted by the defendants landfill owners repeated violations of regulatory and even prior judicial directives, the Department of Environmental Conservation (DEC) exercised its statutory prerogatives (ECL 71-2727 [2];
 
 see also,
 
 ECL 27-1313 [5] [a]), turning to the court once again to secure the closure of an illegal landfill located adjacent to Route 17 in Tuxedo, New York. After trial, Supreme Court ordered the defendants to shut down the landfill. This has not been appealed or challenged.
 

 Supreme Court also decreed at the request of the State Attorney-General that the defendants should post a $4Vá million bond to cover the proven estimated expenses of the landfill closure. That issue and the amount fixed were also the subject of the trial and of adduced evidence, including expert testimony. This relief was designed to secure effectuation of the court’s primary decretal provision — that the illegal landfill be safely closed under the supervision of the regulatory agency charged with that oversight responsibility (ECL 27-1313). Only the bond relief has been appealed by defendants to the Appellate Division and to this court. Their claim in essence is that the court lacked authority to grant this relief. The Appellate Division rejected that argument and unanimously held that the Supreme Court properly exercised its authority. We agree and affirm.
 

 Defendants own a 12-acre site adjacent to Route 17 in Tuxedo, New York. They contracted with defendant Material Transport Service to deposit, weekly for a year, construction
 
 *335
 
 and demolition debris on the site to bring the land level with Route 17 and thereby increase the value of their land. The work began in early March 1987. Within two weeks, a DEC engineer inspected the site and discovered the presence of materials requiring a DEC permit. On March 24, the engineer met with defendant Barone and informed him that, unless he obtained the permit, the site would be closed. On April 12, the DEC regional attorney sent Barone a letter reiterating the Department’s four prior warnings and again advising him that continued dumping was in violation of the law and financial sanctions were possible. Six months later, the dumping was continuing unabated. Faced with defendants’ indifference to or defiance of its repeated regulatory efforts and with increasingly pervasive foul odors emanating from the landfill site, the DEC turned to the courts for help, as authorized bv ECL 71-2727 (2).
 

 Supreme Court’s temporary restraining order of October 5, 1987 barred further operation at the landfill except for the addition of "clean fill” to cover the site and decrease the odors. Even the exception was withdrawn and all landfill activities were directed to be halted later that month, after the trial court was informed that defendants were not adding "clean fill” but rather a dark, oily substance that was apparently industrial waste. The new, total restraining order continued until January 1988, when Supreme Court held 12 days of hearings on the State’s application for an injunction which issued on March 21. The court order, among other things, directed that the industrial waste brought in as "clean fill” be stored initially, so a determination could be made as to whether the material constituted an independent health threat. Nevertheless, the defendants continued to spread the suspicious refuse over the site. The court also ordered defendants to post a $100,000 bond to ensure the odor would be dissipated. Defendants failed to comply and did not post this bond. Throughout the proceedings, the DEC subpoenaed, but defendants never produced, various records as part of its continuing investigation. The trial court concluded that defendants were engaged in "a concerted effort to 'stonewall’ the investigation and to hinder discovery”. After the parties stipulated that the landfill site would cease all operations until a proper DEC permit was obtained, the State applied for security, in the form of a bond, to ensure payment covering the anticipated costs associated with the permanent closure. After a trial on that specific issue — the only one now before us — the
 
 *336
 
 court granted the State’s application and ordered defendants to post a bond of $4 Vi million. Although the court in effect remitted the matter to the DEC for a formal administrative proceeding to determine how best to minimize the closure’s adverse impact on the environment, the court’s judgment finally determined the issues and the injunction action.
 

 The traditional judicial equity power in NY Constitution, article VI, § 7 is implemented by CPLR 3017 (a), which prescribes that "the court may grant any type of relief within its jurisdiction appropriate to the proof whether or not demanded, imposing such terms as may be just.” Our common-law process enhances this peerless feature of Anglo-American jurisprudence
 
 (see, e.g., Phillips v West Rockaway Land Co.,
 
 226 NY 507, 515;
 
 Kaminsky v Kahn,
 
 23 AD2d 231, 237 [and cases cited];
 
 Gibbs v Guild, 9
 
 QB Div 59 [CA]). While "[t]he essence of equity jurisdiction has been the power of the Chancellor to * * * mould each decree to the necessities of the particular case”
 
 (Hecht Co. v Bowles,
 
 321 US 321, 329;
 
 see also,
 
 1 Pomeroy, Equity Jurisprudence § 109 [5th ed]), the limitations on the variety, flexibility and sweep of its potential application must be reflected in a proportionate, prudential discretion by the initial equity trial court and then by a discerning scrutiny, especially of the intermediate appellate court possessing coordinate authority in that respect, along with its appellate review power
 
 (Majauskas v Majauskas,
 
 61 NY2d 481, 493-494;
 
 Northern Westchester Professional Park Assocs. v Town of Bedford,
 
 60 NY2d 492, 499; 1 Newman, New York Appellate Practice § 4.01).
 

 In conjunction with the DEC’s invocation of judicial assistance, Supreme Court was able to look to statutory authority to buttress its bond imposition
 
 (see,
 
 ECL 27-1313 [5] [a]). The statute provides that the DEC may seek to recover expenses in court if it must develop and implement a remedial program for a hazardous waste disposal site after the responsible party has refused. Defendants would be ultimately responsible under the statute for the clean-up expense. The purpose of this ECL authority is consistent with the court requiring defendants to guarantee the costs of rectifying their harm. Defendants’ repeated disregard of DEC notices and at least two court orders entitled the trial court to be concerned about their accountability at the very time the court was fashioning the primary relief in the injunction action. A court, faced with this kind of history, should not have to await a formal contempt phase ensuing perhaps long after the primary de
 
 *337
 
 cree with the possibility of thus passively tolerating increasingly serious environmental damage and personal harms in the interim. This statutory provision is an interlocking support mechanism for the court’s action. When DEC seeks expressly authorized judicial assistance to enforce its rules or regulations
 
 (see,
 
 ECL 71-2727 [2]), and when the facts are so egregious, the court’s power should be flexible.
 

 Evolving manifestations of judicial equity authority may be found in the protection of our environment by direct, prohibitive injunction
 
 (Campbell v Seaman,
 
 63 NY 568, 582-583), by assessment of continuing damages against the polluter
 
 (Boomer v Atlantic Cement Co.,
 
 26 NY2d 219, 226), and by the Commissioner of the DEC invoking a court’s jurisdiction to buttress the regulatory agency’s statutory authority
 
 (Flacke v Onondaga Landfill Sys.,
 
 69 NY2d 355, 363). We hold that equity may appropriately require polluting landfill owners, who have failed to comply with DEC and court directives issued during the proceeding, to post a bond to insure that taxpayers will not bear the cost of accomplishing a judicially decreed elimination of health hazards created by defendants.
 

 Also, we reject defendants’ contention that
 
 Matter of A. G. Ship Maintenance Corp. v Lezak
 
 (69 NY2d 1) and
 
 Morgenthau v Citisource, Inc.
 
 (68 NY2d 211) created a new requirement of express statutory authority for particular equitable relief of the kind at issue here before courts can act. In this case, there is a manifestation of legislative intent to hold polluters responsible for the costs of removing or containing noxious substances (ECL 27-1313 [5] [a]); a grant of legislative authority for the DEC to seek court assistance to enforce the relevant provisions of the Environmental Conservation Law (ECL 71-2727 [2];
 
 compare, Flacke v Onondaga Landfill Sys.,
 
 69 NY2d,
 
 supra,
 
 at 362-363); and a proven need for a bond to insure that these defendants, who had consistently disregarded the DEC’S and the court’s directives, would not in the end be able to escape their responsibilities for the cost of the cleanup. Under these circumstances, the court was not powerless to meet the exigency.
 

 We see no basis for concluding on this record that the lower courts improvidently or abusively exercised — as a matter of law — their invoked authority. The procedure employed by the trial court was punctiliously fair. After defendants at long last represented to the court they would stop operating the landfill site illegally, they were given an opportunity to be heard at a
 
 *338
 
 trial on the Attorney-General’s bond request. The preliminary injunction hearing had earlier also provided defendants a chance to make their case over the course of 12 days of trial. The proof presented by the DEC documented the trial court’s legitimate and reasonable concerns about the landfill site’s potentially adverse impact upon the Village of Tuxedo’s water supply, the Ramapo River, underlying or adjacent aquifer and surrounding property owners. The State’s expert testified with specificity to the elements comprising the estimated minimum cost to clean up the site, i.e., $4ti million. A unanimous Appellate Division reviewed the case and found that, although the expert was extensively cross-examined, "appellants offered no documentary evidence to refute this figure nor did they proffer any experts to invalidate the figure arrived at by the DEC expert
 
 despite being given every opportunity to do so” (State of New York v Barone,
 
 147 AD2d 552, 554 [emphasis added]).
 

 Once the urgent and delayed need to permanently close the landfill and the estimated cost to accomplish that process were established, as definitively as could be predicted at this early stage considering the relatively long-term nature inherent in the landfill closure process, the court had to grapple with defendants’ notoriously bad track record. The court should not be precluded from considering the likelihood that defendants would fail to cooperate and not pay for the judicially declared closure of their landfill; indeed, the evidence of their repeated defiance and long-standing indifference was plentiful. The disdain for numerous DEC warnings, the violation of the temporary restraining order, the subsequent use of industrial waste as landfill cover in direct violation of the interim court order, and the adjudicated "stonewalling” of the investigation all combined to support the court’s dubiety that defendants would fulfill their decreed obligations. The imposition of a bond as security in these extraordinary circumstances was, at the very least, not an abusive exercise of the court’s power.
 

 Protection of natural resources and of threatened citizens requires a circumspect but resolute use of judicial authority. To be sure, courts may flex this kind of muscle only with carefully tailored remedies suited to the issues and proofs presented. By taking expert testimony on the Attorney-General’s application with full opportunity for cross-examination and submission of defendants’ own rebuttal evidence before the bond posting order issued, the court assured defendants a sufficient and proportionate level of specificity to warrant
 
 *339
 
 imposing the bond and for gauging its justification, sweep and duration. Unduly constricting the court’s authority might otherwise encourage greater indifference and transgressions, and reduce the judicial power to an abstract proposition. It would be particularly unpropitious to compel a court in the flagrant circumstances presented in this case to endure delays and virtually certain evasions that could nullify its writ.
 

 Accordingly, the Appellate Division order should be affirmed, with costs.
 

 Chief Judge Wachtler and Judges Simons, Kaye, Alexander, Titone and Hancock, Jr., concur.
 

 Order affirmed, with costs.