OPINION OF THE COURT
Robert E. Lynch, J.
This is the court’s decision upon the trial of this matter held June 28, 1999 to July 7, 1999. Plaintiffs allege in the posttrial brief and proposed findings of fact that the evidence presented at trial demonstrates conclusively that the defendants illegally operated a solid waste disposal facility at the site located on 2 + acres of land at the intersection of Westside Avenue and Wedgewood Heights in the Town of Rotterdam, County of Schenectady. Plaintiffs further allege that the evidence shows that the defendants illegally disposed of construction and demolition (C&D) debris and other solid waste at the site during the period from August 1988 through July 1995. Plaintiffs seek an order of the court permanently enjoining further use of the site as a C&D landfill and directing the defendants to undertake appropriate closure of the site pursuant to requirements established under ECL 27-0703 and the regulations promulgated thereunder. Plaintiffs also seek an order directing defendants to post financial security to ensure the proper closure of the site and to impose statutory penalties.
*492 Plaintiffs commenced this action in April 1994 and sought an injunction to prevent defendants from continuing to illegally operate the facility. By decision/order dated August 5, 1994, this court denied the motion for the preliminary injunction on the ground that there was insufficient credible evidence in support of the application. The parties thereafter engaged in negotiations in an effort to settle the matter. A tentative agreement was reached but the details were never finalized.
In March 1996, defendants, believing that an agreement had been reached, moved to confirm a purported settlement of the action allegedly arrived at between defendants’ attorney and the Office of the then New York State Attorney General Oliver Koppell. Koppell had been defeated in the November 1994 election and had been replaced by Attorney General Dennis Vacco at the time of defendants’ motion. The newly elected Attorney General refused to approve the parties’ alleged agreement. The court determined that no settlement had been finalized and, therefore, denied defendants’ motion. Plaintiffs cross-moved for summary judgment seeking a permanent injunction on the ground that certain of the defendants had been convicted and fined several thousand dollars in the Justice Court for the Town of Rotterdam for violations of 6 NYCRR 360-1.5 and 360-1.7 stemming from the illegal operation of a solid waste management facility without a permit and for the illegal disposal of solid waste at the site. This court granted partial summary judgment to the plaintiffs as against Marc Della Villa and his closely held corporation (New Systems Recycling, Inc.) regarding the operation of the facility without a permit and against Dennis Carringi regarding improper disposal of solid waste. In so finding, this court held that the Justice Court’s determinations against these three defendants, not having been appealed, stood as “law of the case” as against them on the issue of the illegal operation of the facility and the illegal disposal of solid waste at the site on those dates specified in the accusatory instruments filed in the Justice Court upon which convictions had been obtained. This court granted a preliminary injunction by order dated May 28, 1996 but refused to issue a permanent injunction, the ultimate relief sought herein, citing material issues of fact bearing on the nature and scope of the relief to which plaintiffs may be entitled against all the named defendants. Plaintiffs appealed from that determination. The Appellate Division, Third Department, affirmed this court’s determination in that regard (see, State of New York v Della Villa, 257 AD2d 740 [1999]). Plaintiffs were at liberty in this trial to *493 attempt to demonstrate the liability of the remaining named defendants who in the Justice Court either were not so charged or, if charged, were acquitted of the charges.
The trial of this case began on June 28, 1999. By stipulation of the parties’ attorneys dated June 30, 1999 (court exhibit 4) the following facts were agreed to:
(1) Jack Della Villa and corporations he controlled were the owners of the site from 1988 to 1995;
(2) Marc Della Villa and Dennis Carringi and corporations they controlled operated the site between August 1988 and July 1995 by, for example, placing C&D materials at the site;
(3) Defendants are not relying on any exemptions within part 360 except for the one-year exemption of August 1987 to August 1988 (6 NYCRR former 360.1 [f| [1] [x]). The term exemption does not include a beneficial use determination;
(4) The Carringi site, which is immediately west of the stream of the subject site, is not included in this action and was grandfathered as a C&D landfill from February 27, 1989 to December 31, 1990;
(5) Marc Della Villa and Dennis Carringi deposited C&D materials at the site on numerous occasions during August 1988 to July 1995. At times, such activities took place on a daily basis, though interspersed with periods of inactivity;
(6) The sole purpose for defendants’ submission of plaintiffs’ exhibits No. 3 and No. 4 was to satisfy Department of Environmental Conservation’s (DEC) disclosure requirements, as provided in the February 1989 order on consent signed by Marc Della Villa; and
(7) Jack Della Villa and companies he controlled permitted the use of the site for the activities in stipulations Nos. 1, 2, 3 and 5.
At the trial, defendants’ own expert, who had been hired at least as early as 1991 to prepare a possible landfill closure plan pursuant to the February 8, 1989 consent order, opined that three to five years of continued operation of the facility, admitted to at trial, would likely have resulted in the accumulation of another 10,000 cubic yards of C&D debris. This opinion combined with the parties’ stipulation No. 5 (above) demonstrates that at least 10,000 cubic yards of C&D materials were likely deposited at the site during the period from August 1988 (i.e., subsequent to the expiration of any available one-year exemption under 6 NYCRR 360.1 [f] [1] [x]) to July 1995. DEC’s experts testified that the site was operated as a landfill and that its operation mirrored that of numerous C&D *494 landfills across the State. According to the expert’s testimony the subject site differed from those sites only in its lengthy period of illegal operation. Defendants’ own expert (Joseph Bianchine) testified that the site is properly characterized as a landfill and testified that a permit was required to legally place C&D debris at the site. DEC’s landfill closure expert, Richard Baldwin, P. C., testified that the site is accurately characterized as a C&D debris dump. Baldwin also testified that defendants’ landfill was not properly designed, permitted or closed.
Defendants, while admitting to the receipt of C&D materials at the site, seek to defend themselves in this action by alleging (1) that they were not operating and did not illegally operate a C&D landfill, (2) that the construction and demolition materials deposited at the site were materials owned by the defendants, having been acquired by various demolition contracts, and that such materials did not meet the State’s own definition of “solid waste” because defendants intended to use and did use the materials. Defendants argued at trial and in a posttrial motion that such use meant that such materials were not “spent, useless, worthless or in excess to the owners,” nor were the materials abandoned and that, therefore, the materials were not “solid waste” and, accordingly, fell outside the regulatory powers of DEC.
In order to understand defendants’ argument one must appreciate that the defendants’ site is down gradient of a closed municipal landfill operated by the City of Schenectady on Cheltingham Avenue for many years. Defendants argued, without apparent contradiction, that the Cheltingham Avenue landfill was an unlined, minimally capped, and poorly maintained site from which leachate flowed, sometimes in large quantities, onto and near the defendants’ property. The slopes of the Cheltingham Avenue landfill were steep and unstable and subject to erosion. The Cheltingham Avenue landfill was also prone to ponding and erosion which, arguably, exacerbated the leachate problem.
During the pendency of this action defendants dug a trench on or near the boundary between the site and the Cheltingham Avenue landfill. The exposition of the trench, which was approximately 30 feet deep, revealed discrete and distinct layers of materials described as follows: construction and demolition materials on top, followed by a layer of soil, then a layer of materials which all agreed resembled municipal waste. Defendants maintained that the trench demonstrated that the *495 upper most layer of demolition material was deposited as a barrier intentionally placed there by the defendants allegedly to ward off the migration of the Cheltingham Avenue landfill onto the site. No expert testimony was offered to demonstrate either that there had been migration of the sanitary landfill’s contents onto the subject site, rather than initial improper placement, or to show that defendants’ alleged use of the C&D materials was appropriate to achieve the desired result, i.e., to prevent migration of the municipal landfill. In fact, defendants’ own expert testified that a properly constructed interception trench might have been a better method of handling the problem, especially the leachate.
Defendants, who do not deny the placement of C&D materials on the site, seek to escape liability in this action by steadfastly maintaining that they were intentionally placing, crushing and compacting C&D materials on their site not to dispose of such materials as one operating a landfill but rather were legitimately using such material to prevent the further encroachment of the city’s municipal landfill on their land and to prevent the further contamination of their land by leachate from such landfill. Defendants assert that all of the activity on the site which sparked this action was intended and used exclusively for that purpose. Defendants concede that they were sometimes paid dumping or tipping fees for the receipt of the C&D materials at the site but allege that the cost of operating and maintaining the site far exceeded any revenue which such fees generated. They further argue that they had another available site (the Carringi site) where C&D materials could have been disposed of legally if the defendants’ intention was disposal rather than encroachment prevention. Contrary to defendants’ assertion, the nonuse of the exempt Carringi site does not prove their intended “use” of the C&D materials deposited at the subject site.
The question squarely presented for resolution by this court is whether the defendants may escape civil liability for the admitted violations of the statute based upon the defendants’ expressed intent to “use” rather than to “dispose” of C&D materials at the site. This question appears to be one of first impression. The court upon consideration of all the evidence presented finds that they cannot do so.
In arriving at its détermination, the court was not persuaded by defendants’ arguments that the C&D materials allegedly “used” at this site were not “solid waste” as defined in 6 NYCRR 360-1.2. Clearly, 6 NYCRR 360-1.2 (b) (38) defines construction and demolition debris in the following manner:
*496 “(38) Construction and demolition (C&D) debris means uncontaminated solid waste resulting from the construction, remodeling, repair and demolition of utilities, structures and roads; and uncontaminated solid waste resulting from land clearing. Such waste includes, but is not limited to bricks, concrete and other masonry materials, soil, rock, wood (including painted, treated and coated wood and wood products), land clearing debris, wall coverings, plaster, drywall, plumbing fixtures, non-asbestos insulation, roofing shingles and other roof coverings, asphaltic pavement, glass, plastics that are not sealed in a manner that conceals other wastes, empty buckets 10 gallons or less in size and having no more than one inch of residue remaining on the bottom, electrical wiring and components containing no hazardous liquids, and pipe and metals that are incidental to any of the above. Solid waste that is not C&D debris (even if resulting from the construction, remodeling, repair and demolition of utilities, structures and roads and land clearing), includes but is not limited to asbestos waste, garbage, corrugated container board, electrical fixtures containing hazardous liquids such as fluorescent light ballasts or transformers, fluorescent lights, carpeting, furniture, appliances, tires, drums, containers greater than 10 gallons in size, any containers having more than one inch of residue remaining on the bottom and fuel tanks. Specifically excluded from the definition of construction and demolition debris is solid waste (including what otherwise would be construction and demolition debris) resulting from any processing technique, other than that employed at a department-approved C&D debris processing facility, that renders individual waste components unrecognizable, such as pulverizing or shredding. Also, waste contained in an illegal disposal site may be considered C&D debris if the department determines that such waste is similar in nature and content to C&D debris.”
As such definition reveals, the bricks," concrete, masonry materials, soil rock, and wood, drywall and roofing shingles, which defendants admitted were deposited on the site and later bulldozed into more compact form mixing them with earth in the process, are by their very nature “solid waste.” Defen *497 dants’ attempt to escape that designation by referring back to the definition of “solid waste” and related terms found at 6 NYCRR 360-1.2 (a) (1), (2) and (3) is unavailing. That section, as currently in effect in relevant part, provides:
“(a) Solid waste and related terms. (1) Solid waste means, except as described in paragraph (4) of this subdivision, any garbage, refuse, sludge from a wastewater treatment plant, water supply treatment plant, or air pollution control facility and other discarded materials including solid, liquid, semi-solid, or contained gaseous material, resulting from industrial, commercial, mining and agricultural operations, and from community activities, but does not include solid or dissolved materials in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges that are point sources subject to permit under 33 USC 1342 as amended (86 Stat. 880), or source, special nuclear or by-product material as defined by the Atomic Energy Act of 1954, as amended (68 Stat. 923) except as may be provided by existing agreements between the State of New York and the government of the United States (see section 360-1.3 of this Part).
“(2) A material is discarded if it is abandoned by being:
“(i) disposed of;
“(ii) burned or incinerated, including being burned as a fuel for the purpose of recovering usable energy; or
“(iii) accumulated, stored or physically, chemically or biologically treated (other than burned or incinerated) instead of or before being disposed of.
“(3) A material is disposed of if it is discharged, deposited, injected, dumped, spilled, leaked or placed into or on any land or water so that such material or any constituent thereof may enter the environment or be emitted into the air or discharged into groundwater or surface water” (emphasis supplied).
In its 1988 version, which covered activities from its effective date until the effective date of the 1993 amended regulations, defendants argued that the deposited materials could not be classified as “solid waste” unless plaintiffs also proved that the *498 disposed of materials were “spent, useless, worthless or in excess to the owners at the time of such discard or rejection.” (6 NYCRR former 360-1.2 [a] [1].)
Defendants’ point could be well taken if no C&D materials were deposited after the 1993 amendment. Defendants Marc Della Villa and Dennis Carringi testified at trial, however, that the C&D materials were deposited at the site on an irregular but almost daily basis even after this action was commenced in 1994. Such admission places the prohibited activity within the effective period of the 1993 regulations and renders academic the question of whether plaintiffs’ proof was sufficient in regard to the 1988 regulations. Even if that were not the case, this court would still find on this record that the defendants’ deposition of the quantity of C&D materials admittedly deposited at this site and the manner in which they were spread around the site indicates that they were more than a frontline barrier against the encroachment of the city’s landfill. Accordingly, the court finds that even if the defendants claim actual ownership of the materials at the time they were deposited, certain portions of them are hereby found to be “in excess” to the owners and, therefore, subject to DEC regulation under the 1988 version of such regulations for deposits made prior to the 1993 amendment.
In the instant case, the defendants further allege that their use of the C&D materials to prevent the encroachment of the city’s landfill renders it legally impossible for this court to conclude that these materials were “discarded.” This court finds otherwise. As paragraph (3) makes clear, a material may be deemed discarded if it is discharged, deposited, dumped, spilled or placed into or on any land so that such material or any constituent thereof may enter the environment. Thus, no matter what the defendants’ intended “use” of the materials was in placing the C&D materials on this unpermitted site, such placement rendered such materials solid waste subject to regulation by DEC.
The court is likewise unpersuaded by defendants’ argument that the intended use to which the materials were put rendered such materials nonsolid waste pursuant to 6 NYCRR 360-1.2 (a) (4) (vii) and 360-1.15 as “beneficially used” materials. While certain of the C&D materials at issue here might fall within the list of materials eligible for a beneficial use determination by DEC there is absolutely no proof in this record that defendants ever petitioned DEC for such determination or that such a determination was granted. Moreover, as plaintiffs *499 argue, this claim would be an affirmative defense which in this case was not pleaded and, therefore, cannot now be considered (see, CPLR 3018 [b]; Andersen v Mazza, 258 AD2d 726 [3d Dept 1999]).
Finally, defendants seek to avoid DEC’s regulation of their activities at the site by arguing that neither article 27 of the State’s Environmental Conservation Law nor part 360 of the regulations (6 NYCRR) defines the term “environment” and that the term “disposed of’ is so vague and overbroad that it should be declared unconstitutional, citing Carlin Communications v Federal Communications Commn. (837 F2d 546, 557 [2d Cir 1988]). Defendants allege in this regard that the regulation provides inadequate notice of the proscribed conduct because no one is made aware of the dividing line between regulated disposal and a host of innocent acts.
It is beyond question that when the constitutionality of a statute or regulation is raised several presumptions arise. The first is the presumption of validity; the second is that the burden of demonstrating unconstitutionality is with the challenge; and the third is that, where possible, the court will uphold the statute’s or regulation’s constitutionality (Delford Indus. v New York State Dept. of Envtl. Conservation, 126 Misc 2d 355, 358 [Sup Ct, Orange County 1984]).
This court finds that defendants have not satisfied this court that the DEC regulations at issue in this case were so vague or overbroad as to have denied these defendants appropriate notice of the proscribed conduct and that such regulations do not invest DEC’s officials with unlimited discretion to enforce the regulations (see, Tyson v New York City Hous. Auth., 369 F Supp 513, 520 [SD NY 1974]).
Accordingly, defendants’ constitutional argument is found to be nonpersuasive.
Much attention was focused in the posttrial briefs to the issue of whether the veil of the corporate defendants should be pierced to allow for liability to be imposed against the individuals who owned and operated such corporations.
There is ample testimony in this record which demonstrates that the named corporations were little more than paper shells created solely to limit liability. Marc Della Villa and Dennis Carringi testified that these corporations held no meetings, issued no stock, paid no franchise taxes, filed no governmental reports, shared employees, and shared equipment. Marc Della Villa testified that the same was true of corporations owned by *500 Jack Della Villa, namely, Soil Environmental Corporation and Della Villa Bros. Leasing Corp. Plaintiffs herein seek to have this court impose individual liability against the corporate owners for the acts of the corporations.
The law on the subject is clear. In order to persuade the court to pierce the corporate veil plaintiff is obligated to prove that the corporate owners exercised complete domination of the corporation and that such domination was used to commit fraud or a wrong against the plaintiff which resulted in plaintiffs injury (Matter of Guptill Holding Corp. v State of New York, 33 AD2d 362 [3d Dept 1970], affd 31 NY2d 897 [1972]).
The Court of Appeals discussed the concept of piercing the corporate veil at considerable length in the case of Matter of Morris v New York State Dept. of Taxation & Fin. (82 NY2d 135, 140-141) where the Court said:
“ ‘Broadly speaking, the courts will disregard the corporate form, or, to use accepted terminology, “pierce the corporate veil”, whenever necessary “to prevent fraud or to achieve equity” [citations omitted].’
“The concept of piercing the corporate veil is a limitation on the accepted principles that a corporation exists independently of its owners, as a separate legal entity, that the owners are normally not liable for the debts of the corporation, and that it is perfectly legal to incorporate for the express purpose of limiting the liability of the corporate owners [citations omitted] * * *
“The concept [piercing the corporate veil] is equitable in nature and assumes that the corporation itself is liable for the obligation sought to be imposed [citation omitted]. Thus, an attempt of a third party to pierce the corporate veil does not constitute a cause of action independent of that against the corporation; rather it is an assertion of facts and circumstances which will persuade the court to impose the corporate obligation on its own-CI*S ^
“Because a decision whether to pierce the corporate veil in a given instance will necessarily depend on the attendant facts and equities, the New York cases may not be reduced to definitive rules governing the varying circumstances when the power may *501 be exercised [citation omitted]. Generally, however, piercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff’s injury (see, Matter of Guptill Holding Corp. v State of New York, 33 AD2d 362, 364-365 [other citations omitted]; see generally, Presser, Piercing the Corporate Veil § 2.33 [3], at 2-304 — 2-313).”
Applying the above standards to the instant matter leads this court to conclude that the named defendant corporations are subject to the application of this concept. The actions of New Systems Recycling, Inc. in operating the solid waste management facility (the site) without a permit subjects its incorporators, namely, Marc Della Villa, Dennis Carringi and Yaroslaw Zujovic, to personal liability, jointly and severally, for such activity as was alleged in this action.
Defendant Jack Della Villa is likewise held personally liable for the actions or inaction of his closely held corporations, Della Villa Brothers Leasing Corp. and Soil Environmental Corporation, which owned the site and which allowed the operation of this C&D debris landfill on its property. The complained-of activity on this site continued unabated and unchanged both during Soil Environmental Corporation’s corporate existence and after its dissolution in June 1992 by proclamation of the Secretary of State. Since the activity complained of was not part of the winding up of that corporation’s affairs, Jack Della Villa is personally responsible for it (see, Brandes Meat Corp. v Cromer, 146 AD2d 666 [2d Dept 1989]).
So, too, Dennis Carringi is hereby found to be personally liable for the actions of Tri Den, Inc., a corporation which was little more than Carringi’s alter ego. Any liability which attaches to Tri Den, Inc. for the unauthorized disposal of C&D materials at the site is hereby determined to be the liability of its owner and sole shareholder, Dennis Carringi.
The court’s attention now shifts to plaintiffs’ “Fourth” cause of action.
The Consent Order
As previously noted, plaintiffs’ “Fourth” cause of action is addressed to the consent order signed by defendant Marc Della Villa on February 8, 1989. At the signing he was represented *502 by an attorney, Bert Gould. Marc Della Villa testified at trial that he now feels that he was coerced into signing the consent order by DEC’S threat of a $1,000 per day fine and the possible loss of ownership of the site. The site is owned by various corporations owned or controlled by his father Jack Della Villa. According to a site map prepared by the defendants as part of their proposed closure plan submitted pursuant to the consent order, the owners of the site include the following: Mario Osta & Jack Della Villa, Soil Environmental Applications, Inc., and Della Villa Brothers, Inc. An examination of the caption of this action reveals that some of these owners of record are not parties to this action. Moreover, at least one of the corporations, namely, Soil Environmental Applications Corporation, was dissolved by proclamation of the Secretary of State on June 24, 1992. These facts would provide thorny issues of ownership, corporate liability and the necessity of piercing the corporate veil of the nondissolved corporations (discussed above) were it not for the stipulation placed on the record on June 30, 1999. Pursuant to the terms of that stipulation the defendants admitted as follows (transcript, at 378-379):
“me. feller: Second, if we’re talking about the Della Villa site, the Defendants are not contending that the Marc Della Villa, Dennis Carringi, Jack Della Villa and all of his companies, we’re not contending at all that they do not have ownership and control of the site. We admit it. We’re not making any contention about that whatsoever. This is a complete waste of time. We. Agree. We admit it.”
That stipulation further provided as follows (transcript, at 379):
“mr. feller: Well, they either owned the site — in the case of Jack Della Villa, we concede that Jack Della Villa owned the site and yes, are agreed that Marc Della Villa, Dennis Carringi, Tri Den were on the site performing various operations. We don’t argue that those operations constituted disposal but we agree completely that they were on the site and conducting operations. We agree.”
The site was managed by Marc Della Villa. The record shows that Marc Della Villa was presented with the consent order and was allowed to seek legal advice before executing it. He did seek such advice and ultimately signed it on the advice of counsel. Marc Della Villa testified that his attorney told him it was in his best interest to sign it.
*503 In relevant part, the consent order provided as follows:
“Whereas respondent is currently operating a solid waste management facility as the term is defined in Section 360.1 (d)(69) of 6 NYCRR in the Town of Rotterdam, City of Schenectady, County Schenectady, New York, the facility * * * Respondent shall immediately cease accepting solid waste at the facility and shall not operate unless and until a permit to operate is granted.”
At trial Marc Della Villa testified that despite having the advice of counsel, he did not understand at the time that he executed the consent order that the C&D materials which he deposited, or which he allowed others to deliver to or to deposit at the site, were not “solid waste” as defined by then-existing DEC regulations as alleged by his present attorney. He testified that if he had known such to be true he would not have felt compelled to execute the consent order and would not have done so. Defendants’ answer to the complaint contained no allegation that the consent order was based upon a mutual mistake. Defendants did contend that the consent order was obtained by duress and intimidation but the defendants’ proof of this allegation offered at trial was not persuasive.
Absent fraud or other wrongful act on the part of the other contracting party, an individual who signs or accepts a written contract is conclusively presumed to know its contents and to assent to them (22 NY Jur 2d, Contracts, § 19, at 46; British West Indies Guar. Trust Co. v Banque Internationale A Luxembourg, 172 AD2d 234 [1st Dept 1991]). So, too, the law contains a presumption in favor of the legality of contracts and defendant must affirmatively allege illegality in its answer to avoid surprise (Levy v Louis Kram, Inc., 259 App Div 800 [1940]; CPLR 3018 [b]).
Assuming for argument’s sake that Marc Della Villa may have been frightened by the prospect of a $1,000 per day fine or the alleged possible loss of his father’s real property if the State took over the site, the circumstances testified to by Marc Della Villa at trial do not convince this court that he entered into the 1989 consent order by force or duress. In fact, it appears that he gave this matter considerable thought prior to executing the order and that he sought and received legal advice prior to signing.
It is especially telling that from the date of its execution until the commencement of this action by the State seeking a determination that the consent order was violated, Marc Della *504 Villa never commenced an action or special proceeding seeking to set aside the consent order on the grounds that it was obtained by fraud or duress. In fact, the record shows that he caused and directed activity aimed at potential compliance with its terms, i.e., engineering plans for closure of the site in accordance with DEC specifications, and that he paid the non-suspended $1,000 penalty provided for in the order. During the years which passed after the 1989 signing of the consent order, DEC regulations, particularly 6 NYCRR 360-1.7 (a) (3) (vii), regarding landfill closure and postclosure requirements, changed effective October 9, 1993. Closure requirements became more stringent and more costly. The closure plan submitted but not implemented by Marc Della Villa and initially approved by DEC on January 8, 1993 was later revoked as invalid under the subsequently amended regulations. Marc Della Villa was directed by letter dated February 7, 1994 from Richard Forgea, a DEC Region 4 Solid Waste Engineer, to submit a new closure plan in conformity with the 1993 regulation on or before April 1, 1994. No such plan was submitted and this action was thereafter commenced.
The testimony at trial and the stipulation entered into at trial show that after its execution Marc Della Villa voluntarily ignored the consent order’s prohibitions against receiving additional materials at the site without having sought a permit from DEC to do so.
Marc Della Villa now seeks to avoid liability stemming from the breach of the consent order by professing ignorance of its terms and by arguing that the later received materials were not C&D materials within his understanding of “solid waste” which he believed meant household garbage only and not C&D materials. This argument cannot be countenanced in light of the agreement which is clear and straightforward on its face. Marc Della Villa knew the nature of the materials which were deposited at this site and which prompted DEC to pursue enforcement of this consent order.
It is of no consequence that the terminology of the consent order itself was authored by DEC without Della Villa’s input. While the parties may negotiate certain aspects of written contracts, a contract drawn by one party is no less a contract because the other party never contributed language to it. The authorship of a contract is relevant only when the contract language must be construed by the court. In such instances the contract must be construed more strictly against the drafter than against the other party (see, Matter of Saranac Cent. *505 School Dist. [Sweet Assocs.], 253 AD2d 566 [3d Dept 1998]). This case, however, does not present a construction problem nor is ambiguity even alleged. Marc Della Villa’s involvement or noninvolvement in the development of the language of the consent order neither validates nor invalidates the contract.
Clearly, the evidence proves that Mark Della Villa, as operator of the site owned by Jack Della Villa’s closely held corporations, had the authority to enter into the consent order on his own behalf and that having done so he subjected himself to the penalties contained therein. The record further shows that in apparent disregard of the terms of such consent order he subsequently permitted and engaged in the continuing operation of the site after February 9, 1989, including the acceptance of C&D materials at the facility without a permit. He further failed to implement an acceptable closure plan for the facility in the time provided and failed to pay the unpaid and previously suspended portion of the $5,000 civil penalty assessed in the consent order after being notified by DEC of his noncompliance with the consent order.
Accordingly, the court finds that the consent order was valid and that Marc Della Villa violated the February 8, 1989 consent order as alleged in the “Fourth” cause of action set forth in the complaint and is hereby found liable for such penalties as may be imposed upon the remaining portion of this bifurcated action.
Surety
Finally, plaintiffs seek to have this court direct the defendants to post immediately a surety in sufficient amount to insure the proper closing of the site relying upon the Court of Appeals decision in State of New York v Barone (74 NY2d 332 [1989]). While this case bears some similarity to Barone, this court finds that the instant action is distinguishable from Bar-one in that defendants herein have not been charged with depositing industrial waste at the site after having been ordered not to do so by the court. There is no recorded evidence before this court that defendants have violated their voluntary in-court agreement not to deposit C&D materials at the site. Accordingly, plaintiffs’ request for a bond is hereby denied.
Closure
Upon these findings, the defendants are hereby directed to prepare and to submit to DEC a closure plan for the site in conformity with 6 NYCRR 360-2.15 within 90 days of receipt of *506 this decision/order. Upon being advised of DEC’s acceptance of such plan defendants shall, within 60 days thereafter, implement the plan and close the site.
Permanent Injunction
Upon the above findings the court hereby continues and makes permanent the preliminary injunction issued by order of this court dated May 28, 1996 and defendants are hereby enjoined and prohibited from further depositing solid waste, including C&D debris, at the site, and are further enjoined from storing or staying any additional solid waste, including C&D debris, at the site, except as may be permitted and allowed by DEC as part of the defendants’ closure of the site and then only with the express prior written permission of DEC.
Fines and Penalties
The fines and penalties which attach to this finding of liability shall be determined at phase two of the trial which shall be scheduled at a conference to be held before this court at 9:30 a.m. on Tuesday, October 3, 2000.