[993 NYS2d 442]

STATE OF NEW YORK et al., Plaintiffs, and CITY OF NEW YORK, Intervenor-Plaintiff, v GARY PRATO et al., Defendants. (And a Third-Party Action.)

Supreme Court, Putnam County, July 18, 2014

**APPEARANCES OF COUNSEL**

*Eric T. Schneiderman, Attorney General*, Albany (*Philip Bein* of counsel), for plaintiff.

*Zachary W. Carter, Corporation Counsel*, Kingston (*Linda A. Geary* of counsel), for intervenor-plaintiff.

*Keane & Beane, P.C.*, White Plains (*Nicholas M. Ward-Willis* and *Carly S. Grant* of counsel), for Gary Prato, defendant.

**OPINION OF THE COURT**

VICTOR G. GROSSMAN, J.

## Introduction

Plaintiffs, State of New York and New York State Department of Environmental Conservation (DEC), move for summary judgment on four causes of action seeking injunctive relief, civil penalties, and remediation of a site owned by defendant Gary Prato and used as a landfill without a part 360 permit (6 NYCRR part 360). Specifically, plaintiffs seek: to enjoin and halt the operation of the landfill and the discharge of pollutants into the Croton Falls Reservoir; remediation of the landfill including proper disposal of the debris; and civil penalties and damages.

Intervenor-plaintiff, The City of New York, cross-moves for partial summary judgment on liability for the second, third, and fourth causes of action, as well as the sixth cause of action alleging continuous trespass, and demanding injunctive relief that would require Prato to investigate and remediate a contaminated landfill which discharged waste onto the City's land, as well as into the City's Croton Falls Reservoir, as alleged in the City's February 4, 2011 complaint.

After submission of the moving, answering and reply papers, the court entertained oral argument and allowed the parties a final opportunity by letter submission to address the issues raised at oral argument.

## Facts

Prato owns a 27-acre parcel of real property located on Croton Falls Road in the Town of Carmel. His property is adjacent to, and on a hilltop above, the Croton Falls Reservoir, which is part of the New York City water supply system and serves one million people each day. The single-family residence includes a barn, horse ring, small putting green and driving range.

In 2009, Prato decided to build a pool house and garage, and was advised by his landscaper he would need to fill and grade a portion of the property. The landscaper introduced Prato to co-defendant Anthony Adinolfi (Adinolfi), who confirmed the need for fill and said he could provide it from contractors who need to dispose of their dirt removed from construction sites. Prato claims that Adinolfi specifically advised him that the fill material "would be allowed by the DEC" (Prato aff ¶ 13 at 5), that Adinolfi was responsible for the transport, deposit and grading of the fill, and that Prato had no direct involvement or control of the project.

At his examination before trial, Prato was asked:

"Q. Did you ask him [Adinolfi, Sr.] at all where he was going to get the fill from?

"A. I guess I assumed it was from the same location and I really didn't care" (Bein affirmation, exhibit D, at 55).

Prato later acknowledged that the amount of fill exceeded 40,000 cubic yards (Bein affirmation, exhibit D, at 47). He also testified that if he had to pay for it, the fill would have cost $8 per yard, but if someone had to get rid of the fill and needed a place to put it, there would be no cost to him (Bein affirmation, exhibit D, at 50-52).

At his deposition, Adinolfi testified that the fill's cost was between $8 and $14 per yard, and he charged truckers between $50 and $75 per load to dump their debris (plaintiffs' exhibit E, at 25, 44-45). Adinolfi further claimed that he made his money from the trucking companies by being paid to take their deliveries and grading Prato's property without cost to Prato (Bein affirmation, exhibit E, at 17). He denied any role in the depositing of the fill on Prato's property, claiming that his role was limited to grading the property.

Adinolfi explained further that he was hired by Prato (Bein affirmation, exhibit E, at 9). When he first met Prato, he was shown the area on the property to be graded. Prior to hiring Adinolfi, some of the material, an estimated 4,000-5,000 cubic yards, had been delivered and graded (Bein affirmation, exhibit E, at 20). On a daily basis, Prato and his engineer directed Adinolfi and his employees where to dump the material (Bein affirmation, exhibit E, at 18-20). Adinolfi also observed Prato's employees cut down trees, run pipes, create erosion control,

handwork, backfill, and make other efforts (Bein affirmation, exhibit E, at 10, 26).[1]

It is alleged that on, or prior to, June 2010, Prato and other codefendants cleared and disturbed more than 5,000 square feet of steep forested land. Between June and September 2010, large quantities of construction and demolition (C & D) debris were dumped at the site by truckers who paid Adinolfi a fee. This process was accomplished by procuring numerous truckloads of C & D debris from third parties, whereupon Adinolfi directed the placement and grading of the debris, in order to expand a flat area on which Prato could then build a pool house and garage.

On August 31, 2010, DEC officers witnessed six to eight trucks hauling C & D debris to the site each hour. Codefendant Anthony Adinolfi, Jr. (Adinolfi, Jr.) graded the landfill with a bulldozer, while codefendant Michael Marini directed the dumping of waste at the site. Marini stated he was being paid to perform work at the site. Adinolfi instructed his son and Marini not to answer any questions of the DEC officers.

A DEC officer observed a pipe sticking out of the ground at the site with clear liquid running from it. The officer saw the liquid from the pipe running down the side of the landfill through a stone wall onto the City's reservoir land and emptying into the reservoir. The water, which carried silt and sediment, ran alongside a trail of C & D debris from the landfill into the reservoir. Prato told the DEC officer that the liquid was backwash from his swimming pool.

The C & D debris, in addition to brick, concrete and asphalt pavement, also contained plastic, tiles, electrical conduit, scrap

---

1. Adinolfi's involvement on Prato's behalf resulted in his indictment on two counts of operating a solid waste management facility without a permit in violation of ECL 71-2703 (2) (c) (ii), one count of knowingly failing to comply with the State Pollutant Discharge Elimination System requirements in violation of ECL 71-1933 (4) (a) (ii), and one count of the unlawful discharge of organic and inorganic matter into the Croton Falls Reservoir in violation of ECL 71-1933 (1). The charges were elevated to violations of ECL 71-2703 (2) (c) (ii), 71-2703 (2) (a), and 27-0707 (1), based on a prior conviction of a misdemeanor count of ECL 71-2703 (2) (c) (i) on February 15, 2007 in Westchester County. On October 25, 2012, Adinolfi pleaded guilty to violating the crime of ECL 71-2703 (2) (c) (ii) in violation of ECL 71-2703 (2) (a) and 27-0701 (1), arising from the operation of a solid waste management facility at 737 Croton Falls Road, in Carmel, New York. He was sentenced to four months' incarceration, probation, along with being charged a mandatory $7,500 fine and statutory surcharges. At the time of his plea, he admitted accepting money and profiting from truck drivers who came to 737 Croton Falls Road and deposited construction and demolition debris at the site.

metal, coal, coal ash and slag, dimensional lumber, electrical wiring, and unrecognizable pulverized C & D debris. Some of these items had been observed by Prato (Bein affirmation, exhibit E, at 83-88).

Prato, pursuant to 6 NYCRR 360-7.1 (b) (1), was required to obtain a part 360 permit from DEC prior to any disposal, but he failed to do so. He also failed to file a notice of intent with the New York City Department of Environmental Protection (DEP), and he did not prepare a stormwater pollution prevention plan.

In September and October 2010, on three separate occasions, DEC, and/or DEP, officers observed a trail of C & D debris, which had migrated down the landfill slope into the reservoir. On September 30, 2010, the discharge formed a visible plume of sediment suspended in the water from the shoreline at least 20 feet into the reservoir. On October 10, 2010, the observed debris, which had migrated into the reservoir, included dimensional lumber and electrical wiring, suggesting that other components of demolished buildings, such as lead paint, plumbing, and asbestos, were also part of the C & D debris delivered to Prato's property.

Steven Parisio is a regional solid waste geologist employed by plaintiff since 1989.[2] His duties include the investigation of groundwater and surface water contamination associated with solid waste landfills and the inspection of solid waste disposal sites to identify environmental and regulatory compliance issues. He has a Master's degree in soil science from Rutgers University, and he has also been employed by the State of New Jersey as an environmental geologist. He visited the site in September and October 2010. For the September visit, Parisio was denied access to Prato's property, but he was able to inspect the adjacent reservoir property owned by the DEP. Parisio observed waste material transported from the Prato property onto the DEP property and into the reservoir by surface water runoff. This waste material, which requires a permit under 6 NYCRR 360-7.1 (b) (1) (i), included brick, asphalt pavement, concrete, tile, plastic, coal and coal ash. Parisio took samples of the C & D debris that had been deposited below the Prato property on the DEP's and the reservoir shoreline. He performed an analysis of the samples, concluding that they contained a

---

2. Parisio's affidavit of October 14, 2010 is annexed to the original order to show cause (Bein affirmation, exhibit H). A January 16, 2014 affidavit, and a September 26, 2013 report were submitted in connection with the instant motion.

substantial amount of C & D debris mixed with soil. This conclusion is supported by the presence of coal ash and slag, which contains various carcinogens. These materials are not exempt from permit requirements and cannot be accepted by unpermitted landfills under 6 NYCRR 360-7.1 (b) (1) (i).

On the second visit in October 2010, after a heavy rainfall, Parisio saw tiles, dimensional lumber, electrical wiring, and coal and coal combustion bottom ash, which are associated with C & D debris from the interior portions of demolished buildings. These materials are only permitted to be deposited at designated C & D landfills. Some of the debris, as well as the coal and coal ash, had discharged into the reservoir's water.

In December 2010, Parisio performed a waste composition analysis that revealed the presence of waste at or near the site at levels presenting an unacceptable risk to human health and groundwater quality, and including the presence of carcinogens. In addition, lead levels exceeded applicable water quality standards, thereby posing a threat to groundwater and the adjacent reservoir.

Prato submitted a report by Marc Godick of AKRF Environmental Consultants as part of a site investigation and remedial measures work plan.[3] The AKRF report indicated a quantity of fill sufficient to elevate the grade by as much as 24 feet. The AKRF report also acknowledged the findings of the DEC waste composition analysis which revealed the presence of lead, mercury, and zinc, in excess of the DEC limits, in addition to other components of C & D debris.

There is no factual contradiction of Parisio's findings or conclusions before this court.[4] Nearly four years have passed since the discovery of the activities at Prato's property, and Prato has had more than ample opportunity to examine, inspect, challenge and contradict those findings. That Prato has not

---

3. The Godick report is annexed to the Prato affidavit as the second exhibit 1.

4. In Prato's examination before trial, there are references to certain testing and reports on Prato's behalf provided to his attorney, as well as additional testing and reports by an entity known as Hydro Environmental Solutions (plaintiff's exhibit E, at 98-102, 110-111). Neither of the items marked as exhibits at the examination before trial were submitted to the court in connection with the instant motion. According to the Parisio report (at 8), testing by Hydro Environmental Solutions on Prato's behalf, in June 2011, confirmed the presence of polycyclic aromatic hydrocarbons, a class of organic compounds classified as probable human carcinogens, and are associated with C & D waste.

done so allows this court to properly infer that Parisio's findings and conclusions are correct. Consequently, plaintiffs have established the operation of an unpermitted landfill, the site was a solid waste management facility with the presence of harmful wastes, violating the permitting requirements, and threatening the public health and water supply.

The city property and reservoir shoreline were also inspected. Soil, fill, and solid waste were observed migrating from the Prato property down a steep slope to the city property. Coal ash, tiles, plastic, scrap metal and pulverized debris were also observed. Periodic inspections, including one on October 21, 2010, after a hearing before the court, revealed an area of disturbance that exceeded two acres, and solid waste fill eroding from Prato's property over and through a stone wall, damaging trees on city property, with the amount of this damage expanding.

On October 15, 2010, the DEP served a notice of violation alleging: (1) the failure to have a stormwater pollution prevention plan in violation of 10 NYCRR 128-3.9 (b) (3) (iv) and 15 RCNY 18-39 (b) (3) (iv); (2) the discharge of solid waste directly into a reservoir in violation of 10 NYCRR 128-4.1 (b); and (3) the conducting of a regulated activity in such a manner as to constitute a source of contamination to, or degradation of, the water supply in violation of 10 NYCRR 128-2.1 (a) (1) and 15 RCNY 18-21 (a) (1).

## Applicable Law

Prato seeks to avoid liability and responsibility for remediation by claiming he did not know what was being deposited on his property, that he had reason to believe the assurances of Adinolfi that the fill was clean, and that in the absence of actual knowledge he cannot be held responsible. Prato further claims that he cannot be held liable simply because he is an owner of the property. While he does not seriously dispute the contents of the 40,000 cubic yards of fill delivered, unloaded, pushed, and graded on his property, not far from his front door, he does dispute Adinolfi's description of his active role in the project. But, these claims do not withstand scrutiny.

ECL 27-0707 requires all solid waste management facilities to be permitted. 6 NYCRR 360-1.5 (a) prohibits any person from disposing of solid waste except at an exempt or permitted facility. A solid waste management facility is "any facility employed beyond the initial solid waste collection process including, but

not limited to, . . . facilities for the disposal of construction and demolition debris, plants and facilities for compacting, composting or pyrolization of solid wastes." (ECL 27-0701 [2].) A landfill is defined as "land or a disposal facility or part of one where solid waste or its residue after treatment is intentionally placed" (6 NYCRR 360-1.2 [b] [95]). Solid waste management is the "purposeful and systematic transportation, storage, processing, recovery and disposal of solid waste." (ECL 27-0701 [3].) An operator of a solid waste management facility is "the person responsible for the overall operation of the solid waste management facility or part of a facility with the authority and knowledge to make and implement decisions, or whose actions or failure to act may result in noncompliance with the requirements." (6 NYCRR 360-1.2 [b] [113].) Finally, an owner is "a person who owns a solid waste management facility or part of one" (6 NYCRR 360-1.2 [b] [114]).

Using these definitional standards, Prato's property was being used as a landfill and, therefore, is a solid waste management facility requiring a part 360 permit, that no such permit exists, and Prato is the owner of the property and the facility. There is no requirement that the "owner" of such a facility be in a corporate form, and an individual owning property, on which a solid waste management facility is operating for the owner's benefit, can be an owner of the facility. Further, Prato was also active in the operation and supervision of the facility, notwithstanding his claimed lack of participation (Bein affirmation, exhibit E, at 10, 18-26).

The discharge of pollutants from the site onto DEP property and into the reservoir violated Environmental Conservation Law article 17, for which there is strict liability. (*State of New York v City of Yonkers*, 14 Misc 3d 1229[A], 2004 NY Slip Op 51908[U] [Sup Ct, Westchester County 2004], *affd* 35 AD3d 719 [2d Dept 2006].) Justice Nicolai's well-reasoned decision underscores the premise of a strict liability interpretation. He noted that "[a] showing of violation of health or safety regulations is enough to support an injunction without the need to balance the equities." (*Id.* at *11.) The absence of a permit is not disputed.

Environmental Conservation Law § 71-2703, by its structure and language, recognizes a distinction between civil and administrative sanctions, and criminal sanctions. Each section is a separate part of the enforcement arsenal serving different purposes. To that end, a culpable mental state, as defined in

Penal Law § 15.05, is necessary for the purpose of criminal enforcement, but no such culpable mental state is required for civil or administrative violations. Instead, if a culpable mental state is not required, the offense is considered one of strict liability. (*See* Penal Law § 15.10.) These distinctions create different remedies, and the discretion in their exercise should be based on the goals to be achieved, as well as the facts and circumstances of each case. The "DEC, as a State agency, has broad powers to construe the statutes and regulations it administers and should be upheld unless such construction is unreasonable or irrational." (*New York Pub. Interest Research Group v Williams*, 127 AD2d 512, 513 [1st Dept 1987].) Here, in contrast to Adinolfi, no criminal sanction has been sought against Prato. Consequently, the presence, or absence of a culpable mental state, as defined in Penal Law § 15.05, is not relevant to this court's determination. Instead, Prato's liability is based on ECL 71-2703 (1).

Whether Prato is either an "owner" or "operator" of the site at 737 Croton Falls Road is, on the facts here, a distinction without a difference. The terms are not mutually exclusive. The facts establish:

1. Prato is the owner of 737 Croton Falls Road, and he was the owner at the time of the events alleged herein;

2. The Prato property is adjacent to, and uphill from, the New York City Reservoir System;

3. Prato undertook certain physical changes to the property, which required more than 40,000 cubic yards of fill;

4. Prato directed his employees to perform tree removal, site preparation, erosion control, pipe systems and other work;

5. Approximately 5,000 cubic yards of fill had been delivered, deposited, and graded under Prato's control, before Adinolfi had been hired;

6. At the suggestion of his landscaper, apparently due to the size and scope of the project, he hired Adinolfi;

7. Prato remained involved in the project on a regular, if not daily, basis;

8. Prato continued to give direction to the work being done, either directly to his employees and personnel, or through Adinolfi;

9. Prato knew that Adinolfi arranged for trucks of fill to be delivered to the site, and when asked if he knew or inquired from where the fill came, he stated he "assumed it was from the same location and [he] really didn't care";

10. More than 40,000 cubic yards of fill was deposited as a result of Adinolfi's efforts;

11. The fill was provided to Prato without cost, as the truckers paid Adinolfi to dump their loads, which generated a profit for Adinolfi;

12. The cost of $8 to $14 per cubic yard to Prato would range from $320,000 to $560,000, if he had had to pay for the fill;

13. Samples of fill subjected to a waste composition analysis revealed the presence of C & D debris, as well as harmful carcinogens, lead and other metals;

14. No permit pursuant to 6 NYCRR part 360, or ECL 17-0105, 17-0505, and 17-0701 was ever applied for or obtained;

15. Harmful discharge from the site entered the DEP's lands, and the reservoir; and

16. No stormwater pollution prevention plan was ever prepared or filed.

These facts lead to the conclusion that Prato is liable not only as an "owner," but also as an "operator" of the facility. Ownership has been a basis for liability under similar circumstances, especially where there is some activity or conduct by the owner that creates or exacerbates the harm to be avoided. In *Frje Holding Corp. v Jorling* (193 AD2d 1013, 1014 [3d Dept 1993]), the Third Department, on transfer from the Second Department, held the owner of property liable for the disposal of C & D debris on its property, stating "[that the owner's] liability is predicated upon its status as owner and permitee (*see,* 6 NYCRR former 360.1 [b], [d] [50]; *State of New York v Barone*, 147 AD2d 552, 554 [2d Dept], *affd* 74 NY2d 332 [1989])." *State of New York v Barone* also upheld liability against an owner for the acts of the contractor where the landowner was "actively involved in the operation of the landfill" as here. (147 AD2d at 554.)

From a public policy perspective, these principles are consistent with the policies behind a land owner's obligation to abate a public nuisance.[5] The public nuisance "is an offense against the State and is subject to abatement or prosecution on application of the proper governmental agency" and "consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all . . . in a manner such as to . . . endanger or injure the property, health, safety or comfort of a considerable number of persons." (*Copart*

---

5. The court is not addressing the cause of action alleging a public nuisance at this time, as it is not part of the instant motion.

*Indus. v Consolidated Edison Co. of N.Y.*, 41 NY2d 564, 568 [1977]; *State of New York v Schenectady Chems.*, 117 Misc 2d 960 [Sup Ct, Rensselaer County 1983], *mod* 103 AD2d 33 [3d Dept 1984] [upholding State cause of action to compel cleanup of a chemical waste site under public nuisance law].) Under New York law, a landowner is liable for a public nuisance on his property upon learning of the nuisance and having a reasonable opportunity to abate it. (*Conhocton Stone Rd. v Buffalo, N.Y. & Erie R.R. Co.*, 51 NY 573 [1873]; *New York Tel. Co. v Mobil Oil Corp.*, 99 AD2d 185, 188-189 [1st Dept 1984].) As noted in Restatement (Second) of Torts § 839, Comment *d* (1979),

> "liability [of a possessor of land] is not based upon responsibility for the creation of the harmful condition, but upon the fact that he has exclusive control over the land and the things done upon it and should have the responsibility of taking reasonable measures to remedy conditions on it that are a source of harm to others."

Here, Prato knew of the nuisance since 2010. Four years is more than a reasonable opportunity to abate it. Unfortunately, the motion papers and pleadings suggest that he resisted remediation or minimized its need.

Self-serving denials of knowledge, or intent, are of limited value, notwithstanding the difficulty of proving a negative. Certainly, a bare denial of knowledge or intent is insufficient to create a genuine triable issue of fact, especially where those elements are not required. That Prato can receive a benefit in excess of $300,000 worth of fill by looking the other way and claiming not to know the contents of the fill strains credulity, especially when he admitted he knew it could be very expensive (Bein affirmation, exhibit D, at 50-51). That he can arrange for, participate in, and gain the benefit of more than 40,000 cubic yards of fill in the absence of intent is remarkable. He may claim that his intent was to only use "clean fill," but any purposeful attempt to avoid acquiring knowledge should not be rewarded.[6]

---

6. The court notes that any type of paper trail that might support a "clean fill" claim was never provided. When asked for documentation of materials brought to the site, Adinolfi did not have any (Bein affirmation, exhibit E, at 24). When told of the availability of so-called clean material, Prato neither asked how the material was determined to be clean, nor whether there were any sampling results to support that claim (Bein affirmation, exhibit E, at 52-53, 95-98).

Accordingly, it is hereby ordered that plaintiffs State of New York and New York State Department of Environmental Conservation be and hereby are awarded summary judgment on the issue of liability as alleged in the first four causes of action of the verified complaint dated October 13, 2010; and it is further ordered that defendant Gary Prato be and the same is hereby enjoined from any further use of the site at 737 Croton Falls Road, Carmel, New York as a landfill or solid waste management facility, and is directed to investigate, remediate, and clean up the contaminated land at 737 Croton Falls Road, Carmel, New York, and the adjacent lands of the City of New York Croton Falls Reservoir; and it is further ordered that the cross motion of intervenor-plaintiff City of New York be and the same is hereby granted on the issue of liability as alleged in the second, third, and fourth causes of action contained in the complaint dated February 4, 2011; and it is further ordered that defendant Gary Prato, be and the same is hereby enjoined from any further use of the site at 737 Croton Falls Road, Carmel, New York as a landfill or solid waste management facility and is directed to investigate, remediate, and clean up the contaminated land at 737 Croton Falls Road, Carmel, New York, and the adjacent lands of the City of New York Croton Falls Reservoir.