[888 NYS2d 850]

THE PEOPLE OF THE STATE OF NEW YORK, Petitioner, v NATION-WIDE ASSET SERVICES, INC., et al., Respondents.

Supreme Court, Erie County, October 9, 2009

*Andrew M. Cuomo, Attorney General (James M. Morrissey* of counsel), for petitioner. *Michael P. Brundage,* admitted pro hac vice, for FGL Clearwater, Inc., doing business as American Debt Arbitration, respondent. *Mark R. Walling,* for Nationwide Asset Services, Inc., and others, respondents.

## OPINION OF THE COURT

PATRICK H. NEMOYER, J.

This special proceeding was filed by the New York State Attorney General (hereinafter petitioner) in June 2009 pursuant to his authority under Executive Law § 63 (12) and General Business Law article 22-a, which authorize petitioner to sue for restitution, damages, an injunction, and other relief whenever an individual or entity has engaged in repeated fraud, deceptive business practices, false advertising, or other illegality in the carrying on, conduct, or transaction of business. Petitioner also proceeds pursuant to Business Corporation Law § 1303, which empowers him to sue to restrain a foreign corporation from doing business in New York State without proper authorization.

## Background

Respondents Nationwide Asset Services, Inc., Servicestar, LLC, and Universal Debt Reduction, LLC (collectively, Nation-

wide) are interrelated entities created and headquartered in Arizona. Respondent FGL Clearwater, Inc., doing business as American Debt Arbitration (ADA), is an entity incorporated and headquartered in Florida. Nationwide and ADA are in the business of "debt settlement" which is to say the business of negotiating on behalf of highly debt-burdened consumers with those consumers' creditors in an effort to wipe out a portion of each consumer's total unsecured debt. Respondent ADA markets Nationwide's debt reduction program through telephone sales presentations initially made during "cold calls" to credit-distressed consumers, and it is established on this record that Nationwide and ADA split the fees paid by the consumers according to a schedule, ADA for enrolling the consumers, and Nationwide for negotiating on those consumers' behalf with creditors (thus, the court will refer to *respondents'* program, words, and actions).

Basically, respondents represent to consumers that they can eliminate their unsecured debt over a period of time, typically, two to three years, and moreover can do so in a way that will save the consumers a large portion, typically 25% to 40%, of the "Original Amount Due" or "Amount Originally Due" (AOD), a sum referring at once to the consumer's contemporaneous indebtedness on each account, and his/her aggregate indebtedness on all accounts, that the consumer opts to enroll in or designate to respondents' program. Respondents' promise of such significant savings assertedly takes into account the payment of all of the substantial fees charged by respondents (see infra). The consumers are promised that they can achieve such substantial savings by: (1) ceasing all payments to their creditors for the duration of the program; (2) making monthly payments (of amounts typically less than the sums that the consumers already are paying to their creditors each month) directly to respondents; (3) not negotiating personally with their creditors, or with attorneys or collection agencies who might contact the consumers on those creditors' behalf, for the duration of the program; and (4) instead authorizing respondents to negotiate favorable debt settlements with the creditors—albeit not immediately, but rather only after the lapse of some period, usually many months. Those four steps essentially constitute respondents' program. With regard to steps (1), (3), and (4), consumers are told that their default in paying the debt over some period of time contributes to a higher likelihood and probable more favorable terms of eventual settlement because credi-

tors are more willing and likely to compromise debts that are more seriously delinquent. Consumers are told, however, that their enrollment in respondents' program is no guarantee against their creditors' continuing to dun them, placing the debt in collection, or taking legal action on account of such default. Consumers also are instructed or advised to disclose all of their unsecured debt to respondents, enroll or designate all such debt into the program, not withdraw any accounts/debts from the program, and not contract any new debt. With respect to step (2) of the program, after eliciting information regarding each consumer's monthly income and expenses and thereby determining that consumer's available monthly cash flow, respondents require a monthly payment intended to enable that consumer to pay the debt settlement(s) "target[ed]" for negotiation by respondents, as well as respondents' fees, over the anticipated duration of that consumer's participation in the program. Thus, the monthly payments (aside from any amounts earmarked to pay respondents' fees) are accumulated and used to pay any debt settlements. The amount of the monthly payment is typically set at a minimum of $300 but could be set much higher depending on the consumer's available income and expenses and the number of credit accounts and the amount of debt that the consumer opts to designate to be settled through respondents' program.

In exchange for providing such services, respondents charge various fees, including a setup fee, an enrollment fee, a monthly administrative fee (in conjunction with monthly bank fees), and an ultimate settlement fee. The setup fee is a one-time up-front charge of $399. The enrollment fee is equal in amount to three of the monthly payments set for the consumer (thus a minimum of $900 but sometimes a larger amount for those consumers who dedicate a large number and amount of debts to the program). The first three to five monthly payments by the consumer are applied first towards those two initial fees (as indicated, a minimum of $1,299). Only after such payment is any portion of the consumer's monthly payment deposited into a special bank account set up to fund any debt settlement(s) negotiated by respondents. Of course, it is over the period of payment of such fees and the additional months spent waiting for significant sums to accumulate in the special bank account for payment of creditors that the consumer usually becomes seriously delinquent in paying his or her creditors. Once the special bank account is set up for receipt of the consumer's

continued monthly payments, the consumer begins paying respondents an additional monthly administrative fee of $49, plus additional monthly fees (a minimum of around $7 per month) to the bank, Rocky Mountain Bank & Trust, chosen by respondents as the repository of those funds earmarked for settlement. The final fee is denominated the settlement fee and is earned at the time respondents settle each designated account. The settlement fee is invariably set at 29% of the difference between the AOD on each account at the time the consumer embarked upon the program and the amount of the settlement ultimately negotiated by respondents on that account. All of those fees likewise are deducted from the consumers' monthly payments and/or the special bank account funded thereby. Where the special bank account does not hold enough funds to pay the ultimately negotiated debt settlement and respondents' fees, the consumer must remit the shortfall in addition to his or her next scheduled monthly payment.

## The Petition and Supporting Proof

The issue in this proceeding is the truth of the representations made by respondents in offering their services to New York State consumers and respondents' faithfulness in delivering what they have promised to those consumers. The petition states four causes of action against respondents pursuant to Executive Law § 63 (12). The first cause of action alleges that respondents have repeatedly and persistently engaged in conduct amounting to common-law or statutory fraud. The second alleges that respondents have repeatedly and persistently engaged in deceptive acts or business practices in violation of General Business Law § 349. The third cause of action alleges that respondents have repeatedly and consistently engaged in false advertising in violation of General Business Law § 350. The fourth cause of action alleges that respondents, as foreign corporations, have persistently and unlawfully done business in New York without having obtained authorization to do so, in violation of Business Corporation Law § 1301.

With regard to the first three causes of action, petitioner alleges four false and deceptive representations, promises or business practices of respondents. First, petitioner alleges that, according to information provided by respondents themselves in response to subpoenas served and other requests made during the Attorney General's investigation of this matter, respondents rarely achieve the represented savings of 25% or more on behalf

of their New York consumers. Petitioner alleges that, of the 1,981 customers signed up by respondents from January 1, 2005 through May 5, 2008, only 64, or fewer than 3%, had successfully completed respondents' program by September 25, 2008 (and that by respondents' own enumeration and definition of success), whereas 537 consumers had canceled their participation in respondents' program. Petitioner additionally alleges that, of the aforementioned 64 consumers, only six, or approximately .3% of the original 1,981 participants, realized savings of 25% or more after taking into account their payment of respondents' fees.

Second, petitioner alleges that respondents systematically misrepresent the savings realized through their settlements. Petitioner alleges that, to each of their supposedly successful program participants, respondents provide a "Program Completion Summary." Such document lists, for each credit account enrolled by the consumer, the original amount due, the settlement amount, the amount saved, and the 29% settlement fee. The document also accounts for the total monthly payments received from the consumer, and the total amount paid by the consumer, including monthly administrative and bank fees. The document concludes with a statement of the percentage of total savings that the consumer supposedly realized by settling the designated accounts. Petitioner alleges, however, that the document is deceptive because it does not account for the significant enrollment and setup fees paid by the consumers in its recitation of the total amounts paid by the consumer. Petitioner further alleges that the document fails to account for the significant enrollment and setup fees, or the monthly administrative and bank fees, in its calculation of the total percentage saved. Petitioner moreover alleges that the document overstates the savings realized by successful completers of the program by failing to include, in its calculation of the amount saved on any designated account, any amounts by which the settlement payments may have exceeded the AOD on that account. In other words, petitioner alleges that whenever respondents have settled a debt for more than the consumer originally owed, the document identifies the amount saved for that account as zero dollars and nowhere acknowledges the fact or amount of any overage, thereby inflating the total amount and total percentage supposedly saved.

Third, petitioner alleges that respondents fail to honor their guarantee to consumers to the effect that the total paid would

not exceed the original debt owed, even taking into account all fees. More particularly, petitioner alleges that, notwithstanding the representation up front that the 25% to 40% promised savings would take into account or include the payment of all such fees and charges, 27 of the 64 consumers whom respondents represented as program successes actually wound up paying more than their AOD when their various program fees were taken into account. Petitioner alleges that, in order to give effect to the guarantee, each of those consumers should have received a fee adjustment or refund so that their total payment would not have exceeded their AOD.

Finally, petitioner alleges that respondents fail to disclose all of their fees up front, more particularly, the one-time setup fee of $399 and the bank fees imposed monthly. Instead, petitioner alleges, respondents on their Web site set forth the following in response to the "Frequently asked question[ ]":

"All fees are included in the monthly payments you will be making, which are usually less than the combined minimum payments on your credit cards. Included in those fees are your enrollment fees, paid from your first three monthly payments; settlement fees, which equal 29% of the amount we save you, giving us incentive to achieve the best settlements possible; and a small monthly administrative fee in the amount of $49."

Based on its allegations and proof, petitioner seeks various types of relief, including: an order pursuant to Business Corporation Law § 1303 prohibiting respondents from doing business in New York unless and until they obtain authorization to do so; an order permanently enjoining respondents from engaging in fraudulent, deceptive, and illegal acts and practices; an order directing respondents to provide petitioner with a full accounting of all New York State consumers who paid any monies to respondents since January 2005; an order granting "full restitution and damages" to all New York consumers injured by respondents; an order permanently enjoining respondents from engaging in any business dealings with New York consumers until they post a performance bond of $1 million, thereby guaranteeing that respondents will comply with any injunction and further providing a fund out of which additional restitution may be made to consumers defrauded or damaged by respondents; an order pursuant to General Business Law § 350-d imposing a civil penalty of up to $5,000 for each deceptive act

committed by respondents; and an order pursuant to CPLR 8303 (a) (6) assessing special costs of $2,000 against each respondent.

In support of its allegations and demands for relief, petitioner submits voluminous materials, including the affidavits of and documents pertaining to 10 consumers, all of whom were among the 64 consumers whom respondents themselves initially labeled successful participants in the debt reduction program, and eight of whom are among the 27 consumers whom petitioner alleges are owed a guaranteed refund. Each of the 10 consumers, named Blanding, Collazo, Craft, Deserto, Greeley, Jock, Mann, Mathews, Milton and Ventura, describe the circumstances surrounding their enrollment in respondents' program and their very unhappy experience therewith. More generally, petitioner relies on evidence concerning respondents' prototypical communications with New York consumers, particularly including the verbal contents of ADA's telemarketing script, of Nationwide's Web site, and of a sample consumer packet issued by respondents. Petitioner has thereby established the representations, promises, and guarantees made by respondents to their customers. Additionally, petitioner has adduced materials showing respondents' organizational and tax status and listing respondents' 1,981 New York customers. Finally, petitioner submits the affidavit of Elizabeth Blazey, a legal aide in the Attorney General's Consumer Fraud Bureau, and a spreadsheet prepared by her (petitioner's exhibit C). Both the affidavit and the spreadsheet address whether, as alleged by petitioner, the weighted average savings per client (referring mainly to the 64 New York consumers characterized by respondents themselves as successful participants in the program) approached the promised or projected savings of 25% to 40%. The answer to that question is "No," according to Blazey, who by her arithmetic shows that the aggregate weighted average savings of the 64 supposedly successful consumers, taking into account all fees paid to respondents, was just 11.55%.

## Respondents' Answers and Proof

Respondents each have served answers in which they admit certain allegations of the petition but deny its operative allegations, particularly its allegations of fraud, deceptive business practices, false advertising, and (as to three of the four named respondents) unauthorized doing of business in New York. (As to the fourth, respondent Universal Debt Reduction, it is denied

that the entity does any business in New York.) Respondent Nationwide further alleges, as an objection in point of law, that petitioner's claims are barred by the applicable statute of limitations. Finally, respondent Nationwide alleges that the petition fails to state a cause of action and that the relief sought in the petition is excessive and beyond the scope contemplated by the statutes relied upon by petitioner. Thus, respondents' position is that they do not falsely or deceptively promise excessive savings, misrepresent the savings realized from their settlement of debts on behalf of consumers, fail to disclose all of their fees, or fail to honor their guarantee.

In opposition to the petition and in support of their denials and requests for dismissal of the petition, respondents have submitted a series of affidavits made by Karen S. Bradley, Nationwide's customer service manager, responsive to the affidavits of each of the 10 consumers. The thrust of each affidavit of Bradley is that the affidavit to which it responds is replete with untruths and inaccuracies, and that each of the ten consumers (although originally labeled by respondents themselves as among the "successful" participants in the program) failed to properly and fully comply with the program. Bradley thus endeavors to show that respondents did not mislead the ten consumers in any way and did not damage them. To the same general effect as the various affidavits of Bradley is the affidavit of James Myers, ADA's General Manager. Like Bradley, Myers challenges various statements set forth in the consumer affidavits, identifies the various ways in which those consumers who were previously deemed program successes were in fact noncompliant with the program; and basically denies that respondents misled those ten consumers in any way.

Respondents further submit the affidavit of and a spreadsheet prepared by Sonia Newell, Financial Operations Manager for Nationwide. Newell avers that the data initially transmitted by Nationwide to the Attorney General in response to the subpoena contains many errors and inconsistencies that, when corrected, refute the figures and tabulations set forth in petitioner's presentation (itself based on the information initially furnished by respondents).

Respondents further submit the affidavits of Jean Noonan, a Maryland attorney purportedly offered to the court as an expert in the practices of the debt settlement industry and an analyst of respondents' dealings with New York consumers. Noonan has prepared her own extensive set of spreadsheets pertaining to

the 2,248 New York consumers from whom respondents now acknowledge taking money between January 2005 and August 12, 2009. For purposes of her analysis, Noonan divides those 2,248 consumers into the following groups: (1) 116 consumers who generally were compliant with the program and who thus are (now) deemed by respondents to have successfully completed it, inasmuch as they enrolled all eligible debt and allowed respondents to negotiate settlements of all such enrolled debt; (2) 596 consumers who completed the program, albeit not as compliantly; (3) 886 consumers who dropped out of the program before depositing enough in their accounts for respondents to negotiate any debt settlements on their behalf; and (4) 650 consumers who remain active customers of respondents.

With regard to the 116 successful completers, Noonan avers that the mean amount of debt enrolled was about $22,000 per consumer, whereas the median was about $16,000. According to Noonan, those consumers averaged 22 months in the program, and respondents settled their aggregate debt to unsecured creditors at an average of about 50 cents on the dollar. Noonan averred that, among that group, the actual savings was 26.2% in the aggregate, even taking into account all of that group's fees to respondents.

With respect to the 596 who partially completed, Noonan avers that the consumers generally averaged about $25,000 in enrolled debt. Of the approximately $15 million in aggregate debt enrolled by that group of consumers, the consumers in the aggregate had removed approximately $9 million in debt from the program, and respondents thus had been enabled to negotiate settlements for only about $5.2 million of the original $15 million in debt. Those settlements averaged about 54 cents on the dollar. That group of consumers generally were deemed not to have fully completed the program by virtue of their withdrawal of debt from the program, their failure to make one or more monthly deposits into their account, their withdrawal of funds from their savings account, or their opening of new credit accounts.

Finally, respondents submit the affidavit of Sharon Larson, Nationwide's CEO, who addresses petitioner's allegation that respondents failed to honor their monetary guarantee to the 27 of the 64 clients (who were originally represented by respondents as having successfully completed the program) who allegedly wound up paying more in debt settlements and fees combined than their AOD. Larson avers that petitioner's allegation of a

dishonored guarantee is without merit because the allegation ignores the fact that the guarantee explicitly does not apply to consumers who fail to disclose all of their unsecured debts, skip multiple deposits into their special purpose accounts during any one-year period, negotiate with creditors or settle enrolled debts independently of the program, or withdraw enrolled accounts from the program prior to completion. Larson goes on to aver that, for one or more such reasons, or merely because they incurred total settlements and fees that did not in fact exceed their AOD, all 27 consumers listed by petitioner as being entitled to enforce the guarantee against respondents are not in fact so entitled.

## Disposition

Upon the return date of the petition, the parties were unanimous in asking this court to render its determination on the papers alone, and the court thus does so, as follows:

Timeliness

█ The court determines that the claims of the Attorney General are not time-barred. First, to the extent that the petition seeks prospective relief in the nature of a permanent injunction against respondents' continuing alleged fraud, deceptive business practices, false advertising, or conduct of business in New York without proper authorization, the statute of limitations stands as no bar to the claims. Second, to the extent that the Attorney General proceeds on a theory of common-law fraud in quest of damages or restitution for past wrongs of respondents, the claim is controlled by residual limitations period of CPLR 213 (1) (see State of New York v Cortelle Corp., 38 NY2d 83, 86-89 [1975]; see also State of New York v Princess Prestige Co., 42 NY2d 104, 107-108 [1977]). The petition makes clear that the instant claims all accrued since January 2005, well within that six-year period.

Third, to the extent that the petition seeks and this court is inclined to award damages and restitution based upon past acts of deceptive business practices and false advertising outlawed by General Business Law §§ 349 and 350 and statutory fraud made actionable by Executive Law § 63 (12), the claims would not appear to be time-barred even under the three-year limitations period governing an action to recover upon a statutorily imposed liability (see CPLR 214 [2]; State of New York v Daicel Chem. Indus., Ltd., 42 AD3d 301 [1st Dept 2007]; see also Gaidon v Guardian Life Ins. Co. of Am., 96 NY2d 201, 209-210

[2001]; *Morelli v Weider Nutrition Group*, 275 AD2d 607, 608 [1st Dept 2000]). As to consumers who are alleged or admitted to have successfully completed the program, but who are alleged to have been damaged by instances of false advertising or deceptive business practices perpetrated in advance of their enrollment, any damages were not ascertainable prior to completion of the program. With regard to the 64 consumers whom respondents initially described as having successfully completed the program, and with further regard to the 116 consumers whom respondents now contend met the requirements for a generally compliant completion, the court has not been apprised of any who completed the program more than three years prior to commencement of this action in June 2009. Indeed, petitioner maintains this proceeding on behalf of only those New York consumers who enrolled in respondents' program since January 2005, and respondents themselves represent that it generally would take such consumers two years or more, i.e., until about January 2007 at the earliest, to successfully complete the program. Thus, it does not appear that any of the consumers in question were in a position to ascertain their damages, thus giving rise to a choate right of action against respondents, more than three years prior to commencement of this proceeding.

Petitioner's Substantive Allegations

Violations of General Business Law §§ 349 and 350

Treating first the second and third causes of action of the petition, the court determines that the materials submitted by petitioner and respondents support a finding that respondents have and are engaged in deceptive business practices in violation of General Business Law § 349 and false advertising in violation of General Business Law § 350. As to those alleged statutory violations, petitioner is required to establish that respondents engaged " 'in an act or practice that is deceptive or misleading in a material way and that [the consumer] has been injured by reason thereof' " (*Small v Lorillard Tobacco Co.*, 94 NY2d 43, 55 [1999], quoting *Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank*, 85 NY2d 20, 25 [1995]; *Matter of People v Applied Card Sys., Inc.*, 27 AD3d 104, 106-107 [3d Dept 2005], *lv dismissed* 7 NY3d 741 [2006]). While the proof must show that the conduct was or is "likely to mislead a reasonable consumer acting reasonably under the circumstances" (*Oswego Laborers' Local 214 Pension Fund*, 85 NY2d at 26), for conduct to be actionable it need "not necessarily rise to the level of fraud" (*Gaidon*, 94 NY2d at 343). Either verbal

expressions or omissions may serve as the basis for such claims (*see Applied Card Sys., Inc.*, 27 AD3d at 107). If repeated and persistent, such acts of deceptive business practices and false advertising may be redressed by petitioner in an action brought pursuant to Executive Law § 63 (12) (*see generally People v Coventry First LLC*, 13 NY3d 108, 114 [2009], *rearg denied* 13 NY3d 758 [2009]).

At the outset, the court notes that it is faced with the dilemma of whether generally to credit (a) the financial fact and figures advanced by petitioner, figures based on information initially furnished by the respondents in response to subpoenas and other requests during petitioner's investigation of respondents' activities in New York, or (b) the revised financial facts and figures since advanced by respondents in opposition to the petition. With respect to the 64 consumers initially characterized by respondents as having successfully completed the program (a group that includes the 10 consumers who submitted affidavits in support of the petition), the court must credit the financial facts and figures submitted by petitioners based upon the information initially furnished by respondents. As petitioner notes, respondents' revisions of the data previously provided to petitioner pursuant to subpoena are "troubling," to say the least. In any event, faced with the choice of crediting data initially provided by and adverse to respondents and data subsequently recast by respondents almost totally in their own favor following the commencement of this proceeding, the court expressly finds the data initially provided by respondents to be more reliable, to constitute relevant admissions by respondents, and to be far more appropriately considered by this court in determining respondents' liability for its alleged instances of deceptive business practices and false advertising. In particular, the court deems Sonia Newell's averments concerning the supposed inaccuracy of the initial data and the supposed basis for correcting it to be vague and unconvincing.

On a related subject, the court has serious misgivings about the data contained in the 27 revised "Program Summar[ies]" attached to the affidavit of Sharon Larson and in the overlapping set of 10 revised "Program Summar[ies]" attached as exhibits to the various affidavits of Karen Bradley. Again, of those revised program summaries, a subset pertains to each of the 10 consumers who made affidavits in support of the petition. With respect to those 10 consumers, there are striking contradictions between the financial data set forth in those

revised program summaries and the data set forth in the contemporaneous "Program Completion Summar[ies]" actually furnished by respondents to the consumers and then to petitioner. Moreover, as the court understands the revised program summaries, the categories of "Possible settlement amount to creditor," "Possible savings," and "Possible savings %" pertain to credit accounts that respondents did not in fact settle for the consumers in question, either because the consumers withdrew those accounts from the program or failed to reveal those accounts to respondents in the first place as part of their enrollment in the program. It seems to this court that it is rather speculative of respondents to assign "possible" settlement amounts for the purpose of extrapolating "possible" savings amounts and percentages for accounts not actually settled. To be less charitable to respondents, it seems to this court as though much of the data set forth in the 27 revised program summaries has been created out of whole cloth. To state the matter clearly: the court rejects the revised data on credibility grounds.

Turning to the merits of the petition, the court has little difficulty in concluding, based upon proof submitted by both petitioner and respondents, that respondents have persistently engaged in a deceptive business practice and false advertising in *representing that their services "typically save 25% to 40% off" a consumer's total indebtedness*. The court makes clear that the problem is not simply with respondents' use of the words "typical" and "typically," although the court, like petitioner, has serious concerns about respondents' apparent attempt to define their "typical" consumer in a way that excludes at least 95% of those consumers. Rather, by joining their use of the word "typically" with a predicted range of savings, rather than simply an average amount or percentage of savings,[1] respondents misleadingly suggest a great likelihood that enrollees in the program will achieve savings in that range and that the risk of deviation from the range is small. However, the statistics furnished to this court by both petitioner and respondents demonstrate that the risk of deviation from the range is not small, but exceedingly large. Put another way, the statistics furnished by the parties demonstrate beyond any doubt that what respondents represent to be the "typical" or "average" experience of their

---

**1.** The court recognizes that, in one place in their sample consumer packet, respondents represent having saved the average consumer 32% of his/her debt in 2006.

program participants is all too atypical. The information initially subpoenaed from respondents shows that of the 1,981 New York consumers signed up for the program from January 2005 through May 2008, only 64, or fewer than 3%, had successfully completed the program by the end of September 2008 (that, again, is by respondents' own definition of success). More to the point, of those 64 consumers whom respondents initially represented as having enjoyed success in the program, only six, or one tenth of the 64 and .3% of the original 1,981, realized savings of 25% or more after the payment of respondents' fees. Although the figures since offered by respondents paint a somewhat different picture with regard to the proportion of successful completers who realize such 25% savings, in one regard respondents' new data do not paint a different picture. Respondents themselves now contend (or admit) that of the 2,248 New York consumers who enrolled in their program from January 2005 through August 2009, only 116 consumers, or about 5% of the total, are now deemed by respondents to be successful completers of their program. Suspiciously, not one of the 10 consumers who furnished affidavits in support of the petition, and who were all among the 64 consumers initially characterized by respondents as successful completers of the program, are included among the 116 consumers now characterized by respondents as successful completers of the plan. Suffice it for this court to conclude that the extent of the corrections that respondents have found it necessary to make to their initially provided information—and the notable degree to which respondents have recast the subset of successful participants—does not inspire this court to repose any confidence at all in respondents' newly provided information. However, even taking respondents' new figures at face value, the court simply cannot find based upon any common or reasonable understanding of the word "typically" that those New York consumers who enrolled in respondents' program "typically" were relieved of having to pay 25% to 40% of their original indebtedness. Quite evidently, even the ostensibly favorable experience of the small number of enrollees who have saved such substantial sums is not broadly representative of the experience of all New York consumers who have done or are doing business with respondents. There is no merit to respondents' suggestion that reasonable consumers would understand respondents' references to the "typical" consumer as pertaining only to that comparatively rare consumer who, in resistance to all of the extreme financial

and legal pressures inherent in the situation, might complete the program after complying strictly with the program's core requirements. If respondents had been truly intent on conveying that limited understanding, they easily could have said so in their advertising and telemarketing script in approximately those words.

Based upon the documentation presented by petitioner, the court further determines that respondents have repeatedly and persistently engaged in a deceptive business practice insofar as they have, in the "Program Completion Summary" form issued to each consumer who successfully completed the program, *failed to take account of the various fees paid by the consumer in calculating the overall percentage of savings* experienced by that consumer. Clearly, respondents calculate the savings percentages by adding the amount of the aggregate debt settlements and the aggregate settlement fees, and then dividing that sum by the AOD. However, in making that calculation, respondents fail to account for the $399 setup fee, the three-month-payment-equivalent enrollment fee, and the monthly administrative and bank fees. Taking those fees into account invariably lessens the amount and especially the percentage of savings for each successful participant in the program.

On a related topic, the court determines that respondents have repeatedly and persistently engaged in a deceptive business practice insofar as they have *failed to take account of any overages*, or amounts by which debt settlements exceeded the AOD on a particular enrolled credit account, *in calculating the aggregate "Amount Saved"* on the program completion summary prepared for each successful enrollee. As noted by petitioner, the program completion summary characterizes as zero dollars the amount saved on a particular account each time that respondents settle a particular debt for a figure in excess of the AOD on that account. That is not inappropriate or deceptive in and of itself, as to do otherwise probably would do violence to the concept of "Amount Saved." A net cost, after all, is not a "savings," and only an economist would attribute meaning to the concept of a "negative savings." However, the program completion summary is deceptively prepared insofar as it does not take account of the incremental cost to the consumer of settling a debt for more than the AOD in calculating the aggregate amount saved by the consumer as a result of the program. Thus, the program completion summary inflates the total amount saved by the aggregate amount of the overages paid on each such account/debt.

The court further determines that respondents repeatedly and persistently have engaged in the deceptive business practice and false advertising of *failing to honor their guarantee.* By that guarantee,[2] respondents basically promise that "when the Client has completed the Program, the aggregate of all settlements made by the Agency, along with all Agency fees[,] will not exceed the total amount of confirmed debt (including principal and unpaid interest and fees) owed as of the date of Client's initial telephone enrollment." Petitioner certainly has adduced evidence tending to show that certain consumers, namely 27 out of the 64 whom respondents initially portrayed as having successfully completed the program, wound up paying settlement amounts and fees that in the aggregate exceeded—and in some cases far exceeded—those consumers' AOD on the accounts/debts ultimately settled.

However, as respondents urge, the contractual guarantee is expressly limited by its next two sentences, which state:

> "Client hereby agrees and acknowledges that this guarantee will be null and void and have no effect if Client either by intent or negligence fails to identify all of his/her Creditors and related information as of the date of signature on the form entitled 'Creditors List' or fails to adhere to his/her obligations described in this Enrollment and Fee Agreement. Additionally, this guarantee will be null and void if Client skips or fails to make more than one (1) scheduled payment within any 12[-]month period."

As respondents seek to demonstrate, of the 27 consumers in question, 22 failed to disclose all of their existing unsecured credit accounts to respondents at the time of their enrollment and/or skipped more than one scheduled payment within any 12-month period. Of the remaining five out of those 27 consumers, respondents have sought to show by their submission of their revised financial figures that all five wound up paying an aggregate amount in debt settlements and fees that did not in fact exceed their AOD. Respondents have thus sought to show that none of the 27 consumers identified was even arguably deprived of his rights pursuant to the guarantee. (However, the court reiterates that it rejects the revised figures submitted by respondents in favor of petitioner's showing that all 34 listed consumers paid fees and settlements that, in the aggregate,

---

**2.** There are multiple versions of this guarantee contained in the record, but the parties each focus on the version contained in the agency enrollment and fee agreement signed by each of the 10 consumers.

exceeded their AOD.) Moreover, as to those five consumers, respondents additionally attempt to show that they were and are not guarantee-eligible because they entered into settlements with certain creditors outside the program, withdrew certain enrolled accounts/debts from the program, continued to use or pay on enrolled accounts, or opened new accounts. Respondents argue that, in doing so, those consumers "fail[ed] to adhere" to their respective "obligations" under the program, thereby nullifying the guarantee.

As this court understands their argument, respondents seek to demonstrate that their guarantee is so riddled with conditions, limitations, and exceptions as to be no real guarantee at all. Needless to say, this court cannot regard such an argument as being of great help to respondents in seeking to refute the showing that they have engaged in deceptive business practices and false advertising. In any event, the court interprets the guarantee in light of its two proximately expressed conditions only (i.e., that the consumer identify all unsecured debt and not miss multiple payments within a 12-month period), thereby concluding that withdrawing enrolled accounts from the program, or settling with creditors outside the program, or continuing to use or make payments on enrolled or nonenrolled credit accounts, or opening new credit accounts, does not nullify the guarantee. In other words, the court concludes that such actions did not constitute violations of the consumers' explicit obligations under the program (or, more strictly speaking, under the agency enrollment and fee agreement), but rather were, at most, merely departures from respondents' suggestions or guidelines for consumers' successful completion of the program. Moreover, it appears that only in retrospect were the 10 consumers (or any of them) apprised that withdrawal of funds from the special bank account would nullify respondents' guarantee. The court thus concludes that there were five demonstrated instances in which supposedly successful consumers were entitled but failed to receive the benefit of the guarantee.[3] The court additionally concludes that, given respondents' pattern of misleading consumers and exaggerating their savings, those multiple

---

**3.** This determination, again, is a function of the court's giving credence to the contemporaneous records of respondents and more particularly the "Program Completion Summar[ies]" actually furnished by them to the five consumers in question—named Deserto, Bader, Taylor, Baille, and Markel—as opposed to the numerous revised "Program Summar[ies]" generated by respondents after the fact and attached to the Larson and/or Bradley affidavits.

instances of not abiding by the guarantee suffice to demonstrate respondents' repeated and persistent acts of deception aimed at consumers generally, as required in order to give rise to liability under General Business Law §§ 349 and 350 and Executive Law § 63 (12) (*see People v 21st Century Leisure Spa Intl.*, 153 Misc 2d 938, 944 [Sup Ct, NY County 1991] [all that must be shown under statute "is a number of separate and distinct fraudulent or illegal acts which affect more than one individual"]; *see also State of New York v Wolowitz*, 96 AD2d 47 [2d Dept 1983]; *State of New York v Solil Mgt. Corp.*, 128 Misc 2d 767, 773 [Sup Ct, NY County 1985]; *see generally Princess Prestige*, 42 NY2d at 107 [the Attorney General "is not required to establish a large percentage of violations"]).

The court determines, however, that respondents did not repeatedly and deceptively engage in a deceptive business practice and false advertising, in violation of General Business Law §§ 349 and 350, by *failing to disclose all of their fees*. In contending otherwise, petitioner focuses only on one section of Nationwide's Web site purporting to answer "Frequently asked questions." Under the question "What is the cost of your program?" the Web site says:

> "All fees are included in the monthly payments you will be making, which are usually less than the combined minimum payments on your credit cards. Included in those fees are your enrollment fees, paid from your first three monthly payments; settlement fees, which equal 29% of the amount we save you, giving us incentive to achieve the best settlements possible; and a small monthly administrative fee in the amount of $49."

Petitioner thus alleges that respondents fail to disclose to consumers that they also must pay a setup fee of $399 and monthly bank fees as part of the cost of the program. In their telemarketing script and in other written materials, however, respondents readily disclose their $399 setup fee, which they make clear must be defrayed by means of the initial monthly payment or payments, along with the three-month-payment-equivalent enrollment fee, before any monies will be reserved for eventual payment of creditors. Other materials furnished by respondents to New York consumers further make clear that stated monthly and occasional bank fees comprise part of the cost of the program. Therefore, the court does not determine that respondents deceptively conceal the setup fee of $399 and the monthly bank fees from consumers.

Common-law and Statutory Fraud

■ By a parity of reasoning, the court determines that petitioner has sustained its burden of establishing, in support of its first cause of action, that respondents have repeatedly and persistently engaged in fraud, as that concept is liberally defined by Executive Law § 63 (12) (see infra), albeit not fraud as defined under common law. The essential elements of a claim of common-law fraud are representation of a material existing fact, falsity, scienter, deception/inducement, justifiable reliance, and injury (see *New York Univ. v Continental Ins. Co.*, 87 NY2d 308, 318 [1995]; *Channel Master Corp. v Aluminium Ltd. Sales*, 4 NY2d 403, 406-407 [1958]). Insofar as the petition might be construed to allege common-law fraud, the court concludes that this record is lacking in clear and convincing evidence from which this court could infer that respondents harbored the specific intent to defraud or cheat New York consumers. Whatever their telemarketing methods, and however unethical or socially undesirable it may be for respondents to systematically encourage consumers to default on their just debts, and whatever detriment they might cause to desperate consumers in counseling them to a course of action that exposes many of them to unrelenting and unbearable pressure from creditors and successful suit by some such creditors, respondents through their program have undeniably furnished monetarily quantifiable "value" to a demonstrable number of their New York consumers, although nowhere near all or even most such consumers.

Moreover, under the circumstances of this case, except as to the 10 consumers who furnished affidavits in support of the petition, there is no possibility of this court's making the individualized findings of actual and reasonable reliance necessary in order to support a finding of common-law fraud. With respect to those 10 consumers, it is possible for the court to read the affidavits as implying actual reliance by the consumers on certain representations or promises made by respondents. However, with respect to those representations or promises that were demonstrably made by respondents during their dealings with consumers (i.e., what was scripted for recorded telephone calls or set forth explicitly in respondents' written materials), the record shows that what respondents represented or promised was no more than what "usually" happened under its program, or what the experience of a consumer "typically" might be under the program, or what "most" creditors would

do or not do upon learning of the consumer's enrollment in respondents' program. Nowhere in the affidavits of the 10 consumers is it specifically alleged that they were taken in by such representations, and the court thus cannot find that the 10 consumers actually and reasonably relied on such representations to their detriment. Moreover, with regard to other alleged false promises or misrepresentations adverted to by the 10 consumers, the court cannot credit the averments of the 10 consumers that such promises or representations were actually made by respondents. For example, given the written materials submitted by petitioner, the court simply cannot find that consumers Collazo, Ross Craft, Mathews, and Ventura, possibly among others, were actually told by respondents that, if they enrolled in the program, interest and fees would stop accruing on credit accounts on which those consumers had defaulted. Even if respondents had said that, a reasonable consumer would not have believed it and relied on it to his or her detriment. More generally, in light of the scripted presentations and written materials furnished by respondents, the court cannot infer that any of the 10 consumers were promised that their credit rating or score would not be adversely affected by a default or that they would not be harassed, threatened, or sued by creditors or collection agencies if they defaulted on their debts. On the other hand, assuming (against all other available evidence) that the consumers really were told any of that by respondents, as suggested but never quite expressed in the 10 consumers' affidavits, the court again sees no basis for the consumers reasonably to have believed the truth of such promises or representations.

Nonetheless, under Executive Law § 63 (12), petitioner may sue for restitution, damages and injunctive relief in reaction to "repeated fraudulent . . . acts" or "persistent fraud" on the part of a respondent. Moreover, section 63 (12) "broadly constru[es] the definition of fraud so as to include acts characterized as dishonest or misleading and eliminat[es] the necessity for proof of an intent to defraud" (*People v Apple Health & Sports Clubs*, 206 AD2d 266, 267 [1st Dept 1994], citing *Matter of Allstate Ins. Co. v Foschio*, 93 AD2d 328, 331-332 [2d Dept 1983]). "Under section 63 (12), the test for fraud is whether the targeted act has the capacity or tendency to deceive, or creates an atmosphere conducive to fraud" (*People v General Elec. Co.*, 302 AD2d 314, 314 [1st Dept 2003]).

"Since the purpose of such restrictions on com-

mercial activity is to afford the consuming public expanded protection from deceptive and misleading [conduct], the application is ordinarily not limited to instances of intentional fraud in the traditional sense (*Matter of State of New York v Bevis Inds.*, 63 Misc 2d 1088; *see, also, People v Federated Radio Corp.* [244 NY 33, 38-39]; *Matter of Lefkowitz v Bull Inv. Group,* [46 AD2d 25, 28]). Therefore, proof of an intent to defraud is not essential" (*Allstate Ins. Co.*, 93 AD2d at 332).

Nor are traditional concepts of actual, reasonable and detrimental reliance applicable to an action brought pursuant to Executive Law § 63 (12), under which the

"test for fraud is whether the targeted act has the capacity or tendency to deceive, or creates an atmosphere conducive to fraud (*see e.g. State of New York v General Motors Corp.,* 120 Misc 2d 371, 374 [1983]; *People v Life Science Church,* 113 Misc 2d 952, 963 [1982], *appeal dismissed* 93 AD2d 774 [1983], *lv denied* 61 NY2d 604 [1984], *cert denied* 469 US 822 [1984]; *Matter of State of New York v Colorado State Christian Coll. of Church of Inner Power,* 76 Misc 2d 50, 56 [1973]). Executive Law § 63 (12) was meant to protect not only the average consumer, but also 'the ignorant, the unthinking and the credulous' (*Guggenheimer v Ginzburg,* 43 NY2d 268, 273 [1977])" (*General Elec. Co.,* 302 AD2d at 314).

In keeping with the findings made hereinabove, the court concludes that respondents are chargeable with statutory fraud insofar as they have repeatedly and persistently represented that consumers utilizing their services typically save 25% to 40% on their debt; repeatedly and persistently exaggerated the dollar amount and percentages of savings enjoyed by consumers; and repeatedly and persistently failed to live up to their guarantee that consumers will not pay more in combined fees and settlements than their AOD. In all of the foregoing areas, respondents' words and deeds have had the capacity or tendency to deceive or mislead members of the public, as required for liability under the statute.

Violation of Business Corporation Law § 1301

Finally, the court determines that respondents have engaged in repeated and persistent illegal conduct by *doing business in New York State as foreign corporations without having obtained authorization to do so,* as required by Business Corporation Law

§ 1301. In support of the petition, petitioner submits the affidavit of Assistant Attorney General Morrissey, who avers that he has searched the Web site of the New York State Department of State and has found no proof that respondents have authorization to do business in New York State pursuant to article 13 of the Business Corporation Law. Petitioner additionally submits verbiage from Nationwide's Web site, which lists the states in which it is authorized to do business (New York is not among those states), and Nationwide's counsel's letter to petitioner acknowledging that Nationwide lacks qualifications to do business in New York. For their part, respondents Nationwide and Servicestar, and respondent ADA as well, have issued naked denials of any failure on their part to obtain official authorization to do business in New York (there is a further denial that respondent Universal does [or still does] any business in New York). Respondents' papers, however, are barren of any proof that they have obtained such authorization. On the return date of the petition, counsel for ADA vowed to furnish such proof, but the court has yet to see it. The court thus determines that respondents all have failed to qualify to do business in New York State.

Petitioner's Demands for Relief

■ The court turns to the issue of what remedy or remedies are appropriate for respondents' repeated and persistent instances of deceptive practices, false advertising, statutory fraud, and unauthorized doing of business. Petitioner seeks various types of relief, including injunctive relief, an accounting, an award of restitution and damages, the mandatory posting of a bond, imposition of civil penalties, and assessment of court costs, demands that the court will address in turn.

The court determines that, pursuant to Business Corporation Law § 1303, respondents should be *permanently enjoined from doing business in New York State unless and until they obtain authorization* to do so.[4]

The court further determines that respondents should be *permanently enjoined from continuing to engage in the deceptive business practices and acts of false advertising* identified by this decision. In particular, respondents should be permanently enjoined from representing that consumers utilizing their services typically save 25% to 40% on their debt. Further, respon-

---

4. Given the facts and outcome of this case, the court is of the view that this injunction should extend to respondent Universal despite the assertion that it no longer does business in New York.

dents should be permanently enjoined from misrepresenting the dollar amount and percentages of savings in a way that fails to account for all of the various fees paid by those consumers. Further, respondents should be permanently enjoined from failing to account accurately for those instances in which consumers ultimately paid more to settle a particular debt than the AOD on that debt, thereby overstating those consumers' aggregate savings. Finally, respondents should be permanently enjoined from failing to live up to their guarantee that consumers will not pay more in combined fees and settlements than their AOD.

Respondents should not be directed to provide petitioner with a *full accounting* of all New York State consumers who have paid any monies to respondents, or to a marketer acting on respondents' behalf, since January 1, 2005. The court notes that this particular demand for relief is not iterated in the Attorney General's memorandum of law. Perhaps petitioner considers respondents, by their submission of voluminous financial data in response to the petition, to have satisfied the demand for a full accounting of all New York State consumers who have enrolled in respondents' program since January 2005.

Petitioner is not entitled to an order "granting *full restitution and damages* to all injured consumers." First, the court does not quite know what petitioner means by "full restitution." If petitioner means payment of all amounts paid by New York consumers to respondents since January 2005, then the court cannot grant that relief, because significant sums paid to respondents were ultimately devoted to settlement of consumers' debts. Even if petitioner means restitution of all sums paid to respondents as fees, the court still cannot grant that relief, as many consumers who did not cancel their participation within the first several months of their enrollment appear to have received some value from the program in exchange for their payment of fees. The court also finds problematic petitioner's demand for an order requiring respondents to pay restitution to only two specified groups of New York consumers whom petitioner deems to have been harmed by respondents' deceptive business practices. The first group for whom petitioner advocates consists of "consumers who completed their program but paid, or will pay, more in fees and settlements than the amount of debt due at the time they signed up with respondents," whereas the second group consists of "consumers who canceled the program." Petitioner thus seems to leave out the large number of consumers who remain active participants in

respondents' program, many of whom have paid more to respondents than many of those who soon canceled their participation in the program. The court sees no basis for ordering restitution on behalf of those consumers who very quickly experienced buyer's remorse and thereby canceled their participation in the program. That is especially so given that the demonstrated deceptive business practices consisted in respondents' misrepresenting or exaggerating the savings to be realized from participation in the program. In any event, this court is in no position to order "full restitution" in the absence of proof regarding what percentage of respondents' revenues is attributable to their deception and other unlawful conduct (*People v Appel*, 258 AD2d 957, 958 [4th Dept 1999]).

The court will, however, enforce respondents' express guarantee where warranted by established facts showing individualized deception, causation and injury (*see Matter of People v Applied Card Sys., Inc.*, 41 AD3d 4, 8 [3d Dept 2007], *affd* 11 NY3d 105 [2008], *cert denied* 555 US —, 129 S Ct 999 [2009]). The court will, in other words, grant restitution on behalf of those consumers whom respondents have characterized or acknowledged (either as part of the original 64 named consumers or as part of the class of 116 consumers subsequently named) as having successfully completed the program but who paid more in aggregate fees and settlements than their AOD (i.e., on the debts ultimately settled, in their totality) at the time they enrolled with respondents, provided that those consumers did not demonstrably fail to disclose all of their existing unsecured debt to respondents and further provided that those consumers did not demonstrably miss multiple monthly payments within any 12-month period. Petitioner is to monitor or supervise respondents' computation and payment of such restitution and is authorized to apply to this court for additional or further relief, if necessary.

Respondents should be required to post a *performance bond*, one in a form acceptable to the New York State Department of Insurance, as a condition of continuing (or resuming) their conduct of business in New York. Such relief is intended to safeguard New York consumers and is appropriate given respondents' demonstrated deceptive business practices, false advertising, and other illegal activity in New York State. The court determines that bond should be posted in the amount of $500,000 (*see People v Allied Mktg. Group*, 220 AD2d 370 [1st Dept 1995]; *see also Matter of People v Telehublink Corp.*, 301

AD2d 1006, 1007 [3d Dept 2003]; *see generally State of New York v Barone*, 74 NY2d 332 [1989]).

Respondents should be required to pay a *civil penalty* on account of their demonstrated deceptive business practices and false advertising (*see Applied Card Sys., Inc.*, 41 AD3d at 10). Pursuant to General Business Law § 350-d, the court is authorized to assess a civil penalty of up to $5,000 for each and every deceptive act and false advertisement by respondents. Here, petitioner asks that a $200 civil penalty be imposed upon respondents for each of the 1,981 consumers that they signed up between January 2005 and May 2008, for a total fine of $396,200. The court accedes to petitioner's request as to the number of consumers, but in consideration of the pertinent factors, including the extent of respondents' New York-related business and their profitability as revealed by their tax returns (*see Applied Card Sys., Inc.*, 41 AD3d at 10, citing *Matter of Sarco Indus. v Angello*, 23 AD3d 715, 717 [3d Dept 2005]), the court requires respondent to pay $100 per consumer, for a total civil penalty of $198,100. Under the facts of this case, the court considers that to be an adequate sanction and a sufficient deterrent against future misconduct.

Finally, respondents should be required to pay the "additional allowances" or special court costs authorized by CPLR 8303 (a) (6). The statute authorizes "a sum not exceeding two thousand dollars against each" respondent in a proceeding brought by the Attorney General pursuant to Executive Law § 63 (12). In the exercise of its discretion, the court grants petitioner the maximum amount of such special costs against each respondent in this matter (*see Matter of State of New York v Daro Chartours*, 72 AD2d 872, 873 [3d Dept 1979]; *People v Autosure, Inc.*, 131 Misc 2d 546, 550-551 [Sup Ct, NY County 1986]).

Accordingly the petition is granted in part, to the extent of determining that respondents have engaged in repeated acts of statutory fraud, deceptive business practices, and false advertising in violation of Executive Law § 63 (12) and General Business Law §§ 349 and 350, and that respondents have further unlawfully done business in New York without authorization in violation of Business Corporation Law § 1301. Respondents are permanently enjoined from continuing to engage in the deceptive business practices, false advertising, and other illegal acts found by this court. Respondents are further permanently enjoined from doing business in New York State unless and until they obtain authorization to do so, and respondents are

further permanently enjoined from engaging in any business dealings with the consumer public in New York unless and until they post a performance bond in the amount of $500,000. Under the conditions or limitations set forth hereinabove, respondents are ordered to make restitution to those New York consumers who have completed their program but who have paid more in aggregate fees and settlements than the amount of debt due at the time that they enrolled in the program; such restitution is to be in the amount that such settlements and fees exceed the pertinent amount originally due from each consumer. Respondents are ordered to pay a civil penalty of $100 for each of 1,981 consumers that they enrolled from January 2005 through May 2008, for a total civil penalty of $198,100. Finally, respondents are each ordered to pay petitioner special court costs of $2,000.