OPINION OF THE COURT
Philip S. Straniere, J.
Claimant, Dmitri Pavlov, commenced this small claims action against the defendant, Debt Resolvers USA, Inc., alleging that the defendant refused to return monies deposited with defendant for resolution of claimant’s credit card debt. A trial was held on March 25, 2010. Both sides appeared without lawyers. Claimant was assisted by a Russian interpreter.
Claimant testified that he registered with defendant on September 30, 2009 through an on-line application so that the defendant could assist claimant in attempting to resolve $32,601.15 in credit card debt with various creditors. Claimant was to pay to defendant $423.40 a month to be held in an account from which the defendant would attempt to negotiate payment of the debts. Claimant understood that defendant would take $30 each month as a fee for its services. In actuality the contract fee is $40 a month. Claimant stated that the defendant indicated that no payments would be made to any creditor until there was $5,000 in the account. Claimant decided to cancel the contract when he realized he could negotiate settlements directly with creditors. Defendant asserts that there is only $19 left in claimant’s account as the monies paid to date totaling $1,693.60 were used to pay the fees due defendant under the contract. Defendant asserts claimant is not entitled to any refund of fees because he sought to cancel the contract more then 30 days after it was entered into. As set forth below, it appears that claimant’s understanding of the program was not exactly what was set forth in the contract. In fact, it appears that if this agreement is typical of the debt resolution businesses, these entities have successfully transferred Professor Harold Hill’s “think system” of teaching band music without the use of pre-paid-never-delivered musical instruments, as set forth in Meredith Wilson’s “The Music Man,” to the debt settlement industry.
Issues Presented
A. What Services was the Defendant to Provide?
Defendant has submitted copies of all of the documents it alleges make up the agreement between the parties. In a docu *1063 ment labeled “AUTHORIZATION AND CONSENT” claimant agreed to “expressly permit Debt Resolvers USA, Inc. and its agents (‘DRUSA’) to undertake the following on my behalf: [sic]”
“-To all extents [sic] that I am permitted to do so, I authorize DRUSA to communicate and negotiate with banks, creditors, financial institutions, student loan associations, licensed collection agencies as well as any other entities and/or individuals regarding my debt and the specific obligations that DRUSA has undertaken pursuant to my Client Agreement; . . .
“-I understand that any creditor or collection activity, demands, or lawsuits are unrelated to my enrollment in the DRUSA Program and would occur regardless inasmuch I am already in default and have no ability to pay my creditor obligations. My enrollment in the DRUSA Program will not serve to delay, defend or reduce those lawsuits and the program is solely a savings and negotiation program (as described in Client Agreement incorporated by reference herein) and not related to any specific creditor actions.”
In addition, defendant submitted a document entitled “DEBT NEGOTIATION AGREEMENT” which provided:
“1.) Subject Matter of Agreement: Client agrees to retain DRUSA to settle client’s debt through the process of debt negotiation. Such negotiation will be done with the creditors contained on Client’s worksheet (Exhibit 1 attached hereto and incorporated by reference herein). Client agrees that the services provided in this Agreement shall extend only to the indebtedness set forth in Exhibit 1 . . . .
“3.) Client Consent: DRUSA approximates savings on industry standards and will use its best efforts to reach a settlement offer with each creditor listed on Exhibit 1. DRUSA has the right to reject any creditor listed by Client on Exhibit 1. DRUSA shall not settle any debt without the express consent of the Client. Client shall not however unreasonably withhold such consent ....
“6.) Establishment of Client Account: Client will establish a trust or controlled account at a reputable bank, escrow company or other financial institution or service company reasonably acceptable to *1064 DRUSA. Client will utilize these accounts to make withdrawals from the accounts in order to satisfy debt settlements negotiated by DRUSA. Furthermore, such accounts may be used to satisfy fees for services. DRUSA will require Client to provide letters of direction or instruction to the entity maintaining such accounts in order to effectuate approved settlements. All costs of the depository account will be born by the individual client....
“11.) Cancellation: Client may withdraw from this Agreement at any time and for any reason whatsoever. Such withdrawal will become effective ten (10) days after the attached written Notice of Cancellation is received by DRUSA. DRUSA will refund and return any and all fee payments received from client prior to the effective date of the withdrawal from the program if the client cancels this agreement in writing within thirty (30) days of its signing ....
“15.) Creditors: At no time is or has DRUSA advised the Client to stop paying their creditors what is owed them ....
“16.) Client Acknowledgment: Client has chosen to participate in the Debt Negotiation Program and enter into this Agreement because of their ongoing inability to pay their creditors. Client understands that if they fail to pay their obligations their credit will be damaged and their debts may increase. Client also acknowledges that they may be liable to pay income taxes on deficient payments to creditors.
“17.) ADDITIONAL CLIENT ACKNOWLEDGMENTS AND DISCLOSURES:
“a.) Client acknowledges that DRUSA does not provide debt consolidation and financing, nor a loan, nor perform credit repair, nor does DRUSA use Client’s funds to make monthly payments, but that DRUSA only negotiates lump-sum settlements at such times as such funds are accumulated by Client. DRUSA might need to arrange a payment plan with a creditor if it is in the Client’s best interest.
“b.) Client understands that DRUSA cannot give legal advice.
“c.) Client acknowledges that DRUSA has not and will not advise Client to cease making payments to any creditor. Client acknowledges and confirms that Client has lost the ability to pay creditors ‘as agreed’ *1065 and any decision to stop making payments to creditors is completely and independently made by the Client.
“d.) Client understands that creditor negotiations will not begin until there are sufficient funds in Client’s settlement bank account.
“e.) Client acknowledges that creditor is not legally prohibited from pursuing other means of collection including judgment, liens on real property, attachment of liquid assets and garnishment of wages (if state law allows).
“f.) Client acknowledges that Client’s credit score may be adversely affected; when all accounts are settled and reported to the credit reporting agencies, credit scores usually rebound. Client understands that once an account has been settled, credit reporting agencies may report derogatory ‘paid not as agreed’ and/or ‘paid settled’ notations on Client’s credit report.
“g.) Client acknowledges that DRUSA’[s] expressions of the outcome of negotiations are only estimates based on industry expectations regarding negotiations with creditors. Client acknowledges that DRUSA has not made and does not make, any expressed or implied guarantee of results. Client acknowledges that there is no guarantee as to how long the program will take to complete.
“h.) Client acknowledges there can be tax consequences of discharged debt unless Client is insolvent. An opinion client [s/c] is insolvent is based solely on the accuracy of financial data disclosed by Client.
“i.) Client acknowledges and agrees that no representations, other than those contained herein have been made and/or induced Client to enter into this Agreement.
“j.) We cannot give you any legal advice. If you have any legal questions about your case, you should seek the advice of a licensed attorney employed by you who represents your interests only.
“k.) If Client does not revoke this agreement within the thirty (30) day revocation period, then the administrative fee becomes non-refundable.
“1.) Client’s participation in the DRUSA program will not, of itself, cause client’s creditors to cease *1066 any collection efforts. The success of the DRUSA program depends upon client’s participation. If Client terminates the program before Client has saved sufficient funds in its set-aside account to effect a settlement, then the program will not produce the desired results.
“m.) Absent special circumstances, DRUSA will not negotiate any settlements with Client’s creditors until the fees referenced herein have been paid and Client has saved sufficient funds in the Client’s set-aside account to effect a settlement.”
At no place in the agreement does defendant set forth what amount of money must be accumulated in claimant’s account before payments will be made to creditors. Nor does the contract promise that the defendant will be successful at achieving any meaningful benefit for the debtor.
B. What Do These Services Cost?
The credit card debt listed by the claimant in its application totals $32,601.15. The agreement between the claimant and the defendant states the defendant anticipates that the claimant would be in the program for 48 months paying $423.40 a month. After 48 months the defendant would have collected $20,323.20 from the claimant for his account. This is about 62% of the total owed. However, the contract does not provide for the payment of the entire collected amount to the creditors of the claimant. The agreement provides for the defendant to receive a “15% service fee” calculated on the amount of the total debt or $4,890.17. This amount is deducted from the $20,323.20 the claimant is paying into his account leaving $15,433.03 for distribution to creditors. But wait. There’s more. Claimant also agreed to pay $40 as a monthly service charge over the 48-month term of the agreement — a total of $1,920. When this is deducted from the claimant’s account, it leaves $13,513.03 for distribution. In addition, the claimant is agreeing to pay $9.85 each month to the bank maintaining the claimant’s account, another $472.80. So at the end of the term claimant will have $13,040.23 left in his account to pay the $32,601.15 he currently owes. If defendant was successful in negotiating a settlement of each of the claimant’s account, each creditor would be accepting 400 on each dollar owed (40% of the debt). This assumes that there will be no increase in the amount of debt owed over the four-year period. These numbers assume that none of the creditors are *1067 continuing to charge interest at the default rate (probably between 25% and 30% per annum) and that no late charges, over-the-limit fees or other expenses are accruing on the claimant’s account. If this is the case then defendant and not Anne Sullivan is the real “Miracle Worker.” It should also be pointed out that the money deposited for the claimant’s account is not earning any interest. Although the contract implies that the “trust or controlled” account will be established at a bank of the claimant’s choosing, in fact, the account is at an institution selected by defendant or its affiliate and not claimant.
The court realizes that in the consumer debt settlement industry many of these obligations are settled for substantially less than the amount owed, but the plan devised by the defendant does not seem to include the possibility that the creditors would not want to compromise the sums claimed due — leaving the claimant still indebted to that creditor with the money collected for that purpose sitting in an account at some out-of-state institution without any provision in the agreement for the claimant to recover the monies. In fact, because this program does not prevent the creditors from pursuing their legal rights against the debtor, there is nothing preventing a creditor successful in obtaining a judgment against the debtor from levying on this “special” account to satisfy its individual claim.
The contract provides that the defendant will be entitled to a fee in the amount of 15% of the total debt, in this case about $4,890.17 and that the “first three (3) months of payments in Client’s program shall be allocated entirely to settlement fee payments. The balance of the fees shall be paid over the following twelve (12) months of the program.” Based on the numbers presented at trial, after the initial three months of payments, about $301 of every monthly payment by claimant thereafter for the next 12 months would be paid to the defendant for its services. This leaves approximately $120 a month for accumulation for the payment of debt. In addition, the defendant’s program fee disclosure form requires the payment of a monthly “administrative fee of $49.85” which includes a monthly service fee to Global Client Solutions, LLC of $9.85. Apparently Global Client Solutions, LLC, which is an entity with offices in Tulsa, Oklahoma, maintains the account for the benefit of the debtor through defendant. A search of the New York Department of State records discloses an entity “Global Client Solutions, Inc.” having been incorporated in New York in February 2010 as a domestic corporation in Suffolk County. There is no evidence *1068 that the New York entity is the same as or in any manner associated with Global Client Solutions, LLC.
According to the agreement, Global Client Solutions is to open an account at a bank selected by Global Client Solutions. The name of that bank is not disclosed in any of the documents before the court. Yet according to defendant’s contract, the claimant has selected the bank in which to deposit the monies. This representation is not in accordance with the facts nor does it make sense that the claimant, a Staten Island resident, would select an Oklahoma entity to manage an account for the claimant at an unidentified bank.
Based on the statement of account for claimant provided by the defendant the entire $423.40 for the first three months was used for defendant’s fees. This application of claimant’s payment was set forth in the contract. During the fourth month only $19.43 was left in claimant’s account. As pointed out above, because the contract requires that the defendant receive all of its fees during the first year of the agreement, it is unlikely that there will be sufficient funds to negotiate lump-sum settlements with claimant’s creditors for some time, the smallest of which appears to be owed in excess of $2,000.
C. What are the Terms of the Agreement with Global Client Solutions?
Defendant has also submitted a document labeled “Special Purpose Account Application.” It is an agreement between the claimant and Global Client Solutions, LLC “for the purpose of accumulating funds to repay my debts in connection with a debt settlement program (your ‘Program’) sponsored by the organization identified below (the ‘Sponsor’).” The document then refers to an “Account Agreement and Disclosure Statement” being attached and which the claimant acknowledges having received and read. No such additional documentation has been submitted by the defendant or the claimant.
The form then has a paragraph labeled “SPECIAL PURPOSE ACCOUNT OWNERSHIP CONTROL AND USE.” It continued:
“I understand that my Special Purpose Account, when established in accordance with this Application, will be my sole and exclusive property; that only I may authorize deposits to and disbursements from my Special Purpose Account: and that I may withdraw funds from and/or close my Special Purpose Account at any time as provided in the Agreement. I hereby authorize (a) periodic deposits *1069 to be made to my Special Account pursuant to the authorization provided below and (b) periodic disbursements to be made from my Special Purpose Account pursuant to instructions that I may give from time to time. In this regard, I hereby authorize payment from my Special Purpose Account of the fees and charges provided for in the Application and Agreement.”
Interestingly, there is a second copy of that form submitted with defendant’s exhibits. The one referred to above is dated September 30, 2009. The second one is dated October 1, 2009. The second form at the top has a designation “DocuSign Envelope ID:” with a number attached. This is not on the first form. There is also a difference in the “Amount of Debit” box. The first form has it handwritten as $423.40 whereas the second form has it typed as $455.59. Form one has an “account setup” charge of $9 while form two has no charge. Another difference is that form one indicates that the “sponsor” is Debt Resolvers USA while form two has that entry blank. Also form one only has the claimant’s information as the applicant and form two has the claimant’s and Diana Bumnova’s information. Nowhere in either form does it indicate into what bank claimant’s funds will be placed. There is no mention as to whether the account is “interest-bearing” and, if it is, to whose benefit does the interest accrue.
It appears that Global Credit Solutions is nothing more than an Oklahoma company managing accounts for debtors at a bank selected by Global Credit placed by various debt management companies. As an Oklahoma entity, what control, if any, does New York have over Global? “Oklahoma” may be “OK” with Rodgers and Hammerstein, but it does not provide sufficient protection for New York consumers.
D. Is There a Federal Statute Applicable to This Industry?
In recognition of the growing number of Americans seeking assistance in resolving problems arising from consumer debt by contracting with credit repair organizations, Congress enacted the Credit Repair Organizations Act. It is found in 15 USC § 1679 et seq. The statute defines a “credit repair organization” as follows:
“The term ‘credit repair organization’—
“(A) means any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person *1070 can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of—
“(i) improving any consumer’s credit record, credit history, or credit rating; or
“(ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i); and “(B) does not include—
“(i) any nonprofit organization which is exempt from taxation . . .
“(ii) any creditor . . ., with respect to any consumer, to the extent the creditor is assisting the consumer to restructure any debt owed by the consumer to the creditor; or
“(in) any depository institution ... or any Federal or State credit union . . . , or any affiliate or subsidiary of such a depository institution or credit union.” (15 USC § 1679a [3].)
Although it is clear that the claimant contracted with the defendant to assist him in resolving credit card debt which he owed with the intent that paying off these obligations would have a positive effect on his credit, it appears that the defendant has structured its business so as to be outside the coverage of this federal law. Nowhere in its promotional materials or its contract does it specifically indicate that its activities will result in improved credit. In fact, all defendant does represent is that it is being hired to “settle Client’s debt through the process of debt negotiation” and it will establish a program which will require the claimant and other debtors to enter into a “forced savings” plan from which defendant will attempt to negotiate lower payments of claimant’s debts. Defendant does not guarantee that it will be able to settle any of the debts for less than their face amount nor does defendant represent that resolution of these claims will improve claimant’s credit rating and that even if the defendant settles an account the creditor may still report it in a derogatory manner to credit reporting agencies. In fact, claimant is advised to continue paying creditors during this process as there is nothing in the actions undertaken by the defendant which would prevent these creditors from pursuing their legal rights against the debtor.
Although the statute may have intended activities such as those undertaken by the defendant to be subject to the statute, *1071 it is obvious that the defendant has prepared an agreement which seems to be specifically designed to exclude the defendant from the statute’s coverage. The language of the contract appears to deliberately avoid any words which would subject the defendant to the federal law. Debtors contacting entities such as the defendant expect that doing so will not only resolve their accounts, but will improve their credit. It is clear that the defendant does not intend to achieve that purpose no matter what the intention of the debtor is when contracting with the defendant. The federal statute should be amended to expand coverage to this situation.
E. Is There a New York State Law Applicable to Defendant?
There does not appear to be any statute in New York dealing directly with “debt resolution,” “debt settlement” or “debt negotiations.” Article 28-B of the General Business Law governs the business of “Budget Planning.” It defines this activity as follows:
“Budget planning . . . means the making of a contract between a person or entity engaged in the business of budget planning with a particular debtor whereby (i) the debtor agrees to pay a sum or sums of money in any manner or form and the person or entity engaged in the business of budget planning distributes, or supervises, coordinates or controls the distribution of, or has a contractual relationship with another person or entity that distributes, or supervises, coordinates or controls such distribution of, the same among certain specified creditors in accordance with a plan agreed upon and (ii) the debtor agrees to pay to such person or entity, or such other person or entity that distributes, or supervises, coordinates or controls such distribution of, a sum or sums of money, any valuable consideration for such services or for any other services rendered in connection therewith. For the purposes of this article, a person or entity shall be considered as engaged in the business of budget planning in New York, and subject to this article and the licensing and other requirements of article twelve-C of the banking law, if such person or entity solicits budget planning business within this state and, in connection with such solicitation, enters into a contract for budget planning with an individual then resident in this state” (General Business Law § 455 [1]).
*1072 There are various entities excluded from the coverage of the statute including attorneys and type B not-for-profit corporations (General Business Law § 455). The statute then provides that budget planning is prohibited except as authorized in article 12-C of the Banking Law. Article 12-C of the Banking Law governs the activities of budget planners. Banking Law § 579 provides:
“Only a type B not-for-profit corporation as defined in section two hundred one of the not-for-profit corporation law of this state, or an entity incorporated in another state and having a similar not-for-profit status, shall engage in the business of budget planning as defined in subdivision one of section four hundred fifty-five of the general business law of this state except as authorized by this article and without first obtaining a license from the superintendent.”
A requirement of receiving such a license is that the entity must provide “budgeting, educational and/or counseling services ... to the debtors with whom such licensee has a contract to engage in budget planning” (Banking Law § 581 [2]). A review of the defendant’s contract makes it clear that it does not purport to, nor does it provide, “budgeting, educational and/or counseling services” to debtors.
A search of the New York State Department of Banking records discloses that the defendant herein is not licensed by that agency as a “budget planner.” In fact, defendant is registered with the Department of State Division of Corporations as an active “for profit” domestic corporation and not a “type B not-for-profit corporation” as required by the statute. Analysis must be made of the defendant’s activities to determine if the services performed by the defendant are subject to the statute.
It should be noted that nowhere in the contract prepared by the defendant or in the other documents and promotional material the parties provided to the court is the term “budget planner” used. The lack of the use of those words does not mean that the defendant is not engaged in the activities which the New York State legislature has labeled “budget planning” and which requires licensing. The court must analyze the services being offered and not the name given to them in order to determine if the defendant’s activities are subject to the license statute.
When a debtor pays an entity monies in order to budget plan, distribute or supervise, coordinate or control the distribution of *1073 those monies to certain specified creditors or has a contractual relationship with a third party to distribute monies to those creditors, that entity is engaged in “budget planning” and must be licensed. Based on the description of the services it offers to consumers, it must be concluded that the defendant wants a debtor to believe that it does not provide “budget planning” as defined in the law. Defendant collects monies from the debtor and then attempts to negotiate lump-sum settlement of the debtor’s obligation with each creditor given to defendant by the debtor. Defendant does not directly “distribute” the payment to the creditor, it negotiates the lump-sum payment and then has the debtor authorize the payment of the settled claim from an account maintained on the debtor’s behalf with a third party. Because the agreement puts the onus for accepting the settlement and authorization of the payments on the debtor, it cannot be said that the defendant “supervises” the distribution of the monies. Likewise, it cannot be said that the defendant exercised “control” over the distribution of the monies to the creditors. Nor does it direct a third party with whom it has a contractual relationship to engage in those activities. However, it is a closer case as to whether or not defendant “coordinates” the distribution of monies to creditors.
Defendant obtains information from the debtor about credit card accounts which are owed payment because of the debtor’s “ongoing inability to pay their creditors.” Defendant calculates a monthly payment plan and a time frame over which attempts to make payment to the creditors will be made based on the information provided. Defendant requires copies of monthly statements a debtor receives in order to verify the amount of debt and the proper contact information so as to be able to negotiate lump-sum payments. Defendant then negotiates lump-sum settlements with these creditors allegedly for the debtor’s benefit. Defendant identifies a third party, which may or may not be a bank, at which the debtor will open an account into which the monthly payments will be made and from which the debtor will authorize a withdrawal for payment of any obligations on which the defendant negotiates a lump-sum payment. In addition, this special account is set up to be funded by automatic withdrawals from the debtor’s regular bank account to pay the defendant for its services prior to paying any of the debtor’s creditors.
It must be concluded after viewing the totality of defendant’s activities that defendant does “coordinate” the payment of creditors on behalf of debtors for a fee. As such, under New York *1074 law, defendant is engaged in the business of “budget planning” and must be licensed. A more sarcastic look at defendant’s activities might label them as the credit negotiation equivalent of “Seinfeld.” “Seinfeld” had a successful run as a television show about “nothing.” A review of defendant’s contract reveals that, in effect, defendant has promised “nothing.” It guarantees no result, gives no advice other than for the debtor to keep paying his or her bills all in exchange for a nonrefundable fee and the unfounded hope that the defendant’s actions will improve the debtor’s deteriorating financial position.
F. Does Either Statute Create a Remedy in Favor of the Claimant?
The evidence presented establishes that the defendant is not licensed as required by Banking Law § 579. In fact, defendant is not properly incorporated to conduct its business. Defendant is incorporated as a “for profit” domestic corporation pursuant to the Business Corporation Law and not as a “type B” not-for-profit corporation formed pursuant to the Not-For-Profit Corporation Law as required by Banking Law § 579. Article 12-C of the Banking Law does not prescribe any particular penalty for violation of the statute but does give the Superintendent of Banks the right to impose penalties pursuant to Banking Law § 44. The penalties only may be enforced against “licensees” found to be in violation of the Banking Law (Banking Law § 44 [1] [a]) which means that the defendant, not being licensed, cannot be disciplined. Article 28-B of the General Business Law makes it a misdemeanor to violate that article (General Business Law § 457) and would apply to the defendant because it is not licensed, but that relief is not available in civil court.
In reading these statutes, there does not appear to be any civil penalty to be assessed against an unlicensed entity, nor does there appear to be either the creation of a private right of action against either a licensed or unlicensed entity or the preservation of a common-law cause of action other than a statement that the revocation, suspension or surrender of a license will not impair any obligations between a licensee and a client pursuant to a preexisting contract. There is no mention of what rights exist for parties if there is no license.
Although the defendant is not licensed, the contract it entered into with the claimant appears to contain almost all of the required clauses set forth in the Banking Law. What is missing is a disclosure of potential rebates which might be received from *1075 creditors. The statute does not require the debtor to receive the benefit of any rebate, only notice of it (Banking Law § 584). The court must question why “rebates” are necessary if the licensee is supposed to be working for the benefit of the debtor-client.* Additionally, defendant’s contract does not include a “three-day right to cancel notice” (Banking Law § 584-a), but defendant has in fact granted claimant and other clients greater rights than required in the statute by giving them a “thirty-day right to cancel notice” which, if exercised by the client, terminates any obligation of the debtor to the defendant and requires the defendant to return any and all fees received. Defendant asserts that claimant failed to assert the right in a timely manner and therefore is not entitled to any refund.
An examination of the federal law clearly sets forth the damages to which a consumer is entitled if there is a violation of the Credit Repair Organizations Act. This relief includes actual *1076 damages, punitive damages, and attorneys’ fees (15 USC § 1679g). However, as pointed out above, the services being rendered by the defendant do not fit into the coverage of the federal law and no such equivalent remedy exists under current New York law.
Claimant is left with the anomalous situation of having defendant’s contract be subject to New York law with the New York statute failing to provide a remedy while the federal law provides a remedy but does not cover defendant’s agreement.
Because defendant is not licensed as a “budget planner” and the activity offered is “budget planning” under New York law, defendant’s contract is illegal and unenforceable in New York. Defendant is required to refund all monies paid by claimant.
Conclusion
Judgment for claimant. Defendant is engaged in the business of budget planning. Under New York law such activity must be licensed. Defendant is neither licensed nor properly incorporated. Defendant’s contract is unenforceable. Defendant is required to refund all monies paid by claimant. Claimant is due a refund of $1,693.60.
In addition, this court has consistently held that the failure to be properly licensed constitutes a deceptive business practice under General Business Law § 349. Claimant is recovering his actual damages, the refund of his money, because defendant is unlicensed. Therefore, the damages awarded for violating General Business Law § 349 are limited to an additional $50.
Judgment for claimant in the amount of $1,743.60 ($1,693.60 as the amount to be refunded plus $50 for violating General Business Law § 349) together with interest from October 15, 2009, the date claimant’s bank account was first debited by the defendant, costs and disbursements.
NOTE
For the past several years the Civil Court of the City of New York has been inundated with consumer debt litigation with filings surpassing 300,000 a year. The vast majority of these cases result in default judgments being entered against defendants. Of the about 30% of defendants who do appear and answer, the vast majority, perhaps as many as 90%, are self-represented. Each year the number of persons indicating they have contracted with debt counselors for assistance continues to grow. Invariably, when questioned by the court, these defendants indicate *1077 that they have been paying money to these entities for resolution of their credit card debt with few of the debtors able to verify that creditors are in fact being paid in a timely manner, if at all. If the agreement and services of the defendant herein are typical of the industry, then the situation is fraught with the potential for abuse. Persons already in financial difficulty would be easy prey for unscrupulous businesses collecting money from them for resolution of creditor problems only for the consumer to learn no payments have been made in that regard.
The court calls on the New York State legislature and Congress to enact meaningful legislation in this regard. In the absence of state action, federal legislation may be necessary to cover these entities engaged in interstate commerce. New York must act to redefine just what actions are being covered. Calling this “budget planning” is confusing and does not really cover the activities of this defendant and others. The court could only find one reported case in this regard and in it the New York Attorney General had to seek redress under General Business Law § 349, alleging the activities amounted to a deceptive business practice (People v Nationwide Asset Servs., Inc., 26 Misc 3d 258 [2009]). These entities are engaged in debt management, debt settlement, debt negotiation or debt resolution and that is the activity that should be regulated.

 Is not “rebate” a euphemism for “kickback?” And are “kickbacks” generally not only frowned upon, but in most situations illegal? If the debt settlement/budget planning industry permits a “rebate” which is money paid to the settlement agent for resolving the debt, presumably the creditor would be willing to reduce the amount owed to them by the debtor and not pay the settlement agent a fee. Is not the reason why the budget planner/debt negotiator is being paid by the client to negotiate the best deal for the client? A system that permits kickbacks, I mean rebates, is designed to have the debt settlement/budget planning agent take into consideration “what’s in it for me” and not the best interest of the client. It seems obvious that individuals who engage the services of a budget planner/debt settlement negotiator are doing so in the belief that the person hired is working for their, the client’s, benefit, and not engaged in some symbiotic and parasitic relationship with the creditor and debtor respectively. One of the culprits cited by many experts as causing the current mortgage crisis was the existence of the “yield spread premium” in residential real estate transactions. This fee was, in effect, a payment by the mortgage lender to the mortgage broker for placing the loan. The broker received this compensation in addition to the fees paid to him or her by the borrower. This additional compensation to the mortgage broker from the lender appears to have motivated certain mortgage brokers to put their own interests ahead of those of their clients even though they were being compensated by the client for presumably finding the best mortgage for the borrower. The fact that both the New York State legislature and the state agencies supervising the mortgage industry have failed to make mortgage brokers fiduciaries for their clients is not only troubling hut permitted this situation to exist and contributed to the mortgage meltdown with people who could not afford mortgages knowingly being placed into loan products they could not afford. Apparently in recognition of the monster that was created, there is currently legislation before the United States Senate which will put an end to the yield spread premium practice of the residential mortgage industry (2010 US Senate Bill S3217). It appears that the New York legislature has sanctioned a similar undefendable process for budget planners-debt negotiators.